970 P.2d 731 (1999)
137 Wash.2d 227
In the MATTER OF the DISCIPLINARY PROCEEDINGS AGAINST Honorable Ralph G. TURCO, Tacoma Municipal Court Judge.
No. JD 13.
Supreme Court of Washington, En Banc.
January 28, 1999.
*733 Edwards, Sieh, Smith & Goodfriend, Catherine W. Smith, Seattle, Counsel for Commission on Judicial Conduct.
Kurt Bulmer, Seattle, Counsel for Judge Turco.
*732 TALMADGE, J.
We must determine in this case whether the extrajudicial conduct of Tacoma Municipal Court Judge Ralph G. Turco violated the Canons of Judicial Conduct, and the appropriate sanction, if any, for such violation. We hold Judge Turco violated Canons 1 and 2(A) by intentionally striking or pushing his wife in a public setting, causing her to fall to the ground. Although the Commission on Judicial Conduct recommended Judge Turco's censure and removal from the bench for his misconduct, we disagree. We order that Judge Turco be censured and suspended from the bench without compensation for a period commencing October 21, 1998 through the end of his term of office. We further order him to complete a domestic violence program as described in RCW 26.50.150 before he may serve in any future judicial capacity.

ISSUES
1. Was Judge Turco prejudiced by delay so that the charges should be dismissed?
2. Did Judge Turco violate Canons 1 and 2(A) by his extrajudicial conduct of pushing or shoving his wife in a public setting?
3. What sanction, if any, is warranted for violation of Canons 1 and 2(A) in this case?

FACTS
Judge Ralph Turco was admitted to the practice of law in Washington in 1961. He was a deputy prosecutor until 1964, whereupon he went into private practice. He had a general law practice until 1991, when he was elected a Tacoma Municipal Court judge.
On December 8, 1995, Judge Turco and his wife, Frances Adrian (Pat) Turco, attended a madrigal feast at a Tacoma church. According to Mrs. Turco, she drove herself and Judge Turco to the church. The judge exited the car and entered the church vestibule without waiting for her. She was delayed by having to remove from the trunk of the car a wreath and some baskets she was bringing to the event.
When she finally entered the vestibule of the church and placed the wreath and baskets on the floor, she approached Judge Turco, who was waiting for her there, and noticed he appeared to be very angry. Mrs. Turco testified Judge Turco said to her, "I've got these God damn tickets, why the hell did you keep me waiting." Report of Proceedings at 23. She says she responded, "Had you helped me with the items from the trunk, it would have taken less time." Id. Mrs. Turco then testified: "He said to me, `Nobody talks to me like that and gets away with it,' and he was rightI could hear him and he struck me and I fell to the floor." Id. She described being struck and falling to her knees with her purse flying open and its contents spilling out onto the floor. Report of Proceedings at 24.
Under questioning by the presiding judge at the disciplinary hearing, Judge William Howard of the Jefferson County Superior Court, Mrs. Turco testified as follows:
Q. And you have testified that the judge was angry. Was there anything other than the words that were spoken that led you to believe that he was angry?
A. Yes, he was very red faced and he said he had the God damn tickets and why did I keep him waiting, and I knew that he was upset when he started using that language.
Q. You testified that the judge was behind you and that you were struck. Is there any way of describing the degree of force with which you were struck?
A. Only that it was forceful enough for me to fall to the floor, if that's an answer.
Q. You were examined concerning the shoes that you were wearing at that time.
A person might fall because they were caught off balance, they might fall because they were struck real hard, and I'm asking *734 a question to try to find out just how you felt, the extent of that impact.
A. It was [a] severe, powerful impact and it startled me that he would, you know, strike me in public, so it was just a pretty forceful blow to my back.
Q. Did you see it coming?
A. No, sir, I didn't.
Q. Did you have any warning that you were about to be struck?
A. No, I didn't.
Report of Proceedings at 52-53.
Judge Turco claims he did not push his wife. He says her fall was an accident:
Q. [Direct examination] Now, you don't deny that your arm had contact with your wife, do you?
A. [Judge Turco] No.
Q. What part of her body did your arm have contact with?
A. As I recollect, it was her left shoulder, the back part of her left shoulder.
....
Q. At the time you had contact with your wife's shoulder, were you upset with her?
A. Well, what I said is, "I don't need this" and I kind of, I don't know, I kind of went like that and I caught her shoulder and she went down to her knees, and I was shocked that she went down. She got right back up. I was disgusted and kind of walked out of the door [of the church]. She came out and got me.
Q. What didn't you need?
A. What?
Q. You said "I don't need this." What did you mean?
A. I didn't need all that carping, all this being on my back about something I didn't think I was at fault about and just raising Billy-Dickens with me.
Q. Did you hit her on purpose?
A. No.
Q. How do you account for the fact that there was contact and she wentif you didn't hit her on purpose, that she ended up down on her knees?
A. You know, I think she was kind of turning and I think she lost her balance. I didn't touch her very hard. I didn't intend to touch her even. I just went, "I don't need this." I was kind of disgusted with the whole thing.
Report of Proceedings at 113-16. On cross-examination, Judge Turco testified he had physical contact with his wife, but he did not help her to her feet or apologize to her.
There were two witnesses to the incident. One was Joann Moran, a close friend of Mrs. Turco who served as a nurse for 20 years in the Air Force, retiring as a lieutenant colonel. She testified unequivocally that Mrs. Turco's fall was not accidental:
Q. [Direct examination] Now, going back to that incident or this fall, did you notice whether or not Mrs. Turco was unsteady on her feet and maybe fell, just accidentally fell over on to the floor at the madrigal feast because of her high heels?
A. No, she was shoved.
Report of Proceedings at 62. Under questioning by Judge Howard, she reiterated that testimony:
Q. [Judge Howard] Is there any way that you could describe just how that took place, when you say it wasn't a gentle tap? A. Well, he just said, "Nobody is going to talk to me" in a loud voice and shoved her and she fell down and she got right up again rather stunned, and that's all I can remember about that incident.
Report of Proceedings at 70. Ms. Moran's testimony was somewhat at odds with Mrs. Turco's, in that she said Mrs. Turco and Judge Turco were facing each other when the contact occurred. She testified, "Well, as I remember, he reached over, using his right arm, and hit her left shoulder." Report of Proceedings at 65. Mrs. Turco said the judge was behind her when he shoved her, as did the other witness to the incident.
Ms. Moran also testified Judge Turco admitted to her at a later Elks Club banquet he intentionally pushed Mrs. Turco:
Q. [Direct examination] Did he convince you that he didn't shove Mrs. Turco to the floor?
A. Well, I said, "Well, there's going to be a problem about the incident about you shoving her to the floor." He said, "Naw, *735 I didn't shove her, I didn't shove her, I just pushed her."
....
Q. [Cross-examination] Now, at this meeting at the Elks Club did Judge Turco dispute the use of your word shove?
A. Yes.
Q. Was it apparent to you, to him there was a distinction between the word shove and push?
A. Yes.
Q. Was it apparent to you that the distinction he was making was the difference between intentional and accidental?
A. Well, it certainly wasn't accidental.
Q. Did he act like he thought it was accidental?
A. I don't think so.
Report of Proceedings at 61-62; 67.
The other witness to the incident was Mark Rake-Marona, the director of Franciscan Hospice and a member of the board of directors of the Tacoma Master Chorale, the organization performing at the madrigal feast. His function that evening was to act as greeter and announce people coming into the hall "as if they were nobility entering into King Henry's court." Report of Proceedings at 75. On direct examination, he said Judge Turco appeared angry, exchanged words with Mrs. Turco, and "then it appeared that he gave her a shove and walked out the door." Report of Proceedings at 79-80. On cross-examination, Rake-Marona equivocated somewhat:
Q. Okay. Now, when you saw the contact, there can be contactI'm trying to get your gauge of sort of the force. When you say the contact, would you say the contact was consistent with only an intentional shove or could it have been consistent with an intentional shove or accidental shove?
A. It's really hard to characterize exactly what it was, but he meant to touch her and it looked like, you know, he meant to give her a little push.
Q. So your perception was that it was consistent with an intentional shove or could it have been consistent with an accidental shove?
A. Well, I was thinking about that and, you know, it's hard for me to visualize exactly what it looked like. I remember more than anything the shock of seeing it happen and, you know, what I told people was I saw someone, I saw a man shove his wife, and so I really felt like it was intentional.
Q. You and I talked the other day?
A. Yeah.
Q. When you and I talked, didn't you tell me that at that time you believed it could have been consistent with either?
A. I did, and, again, the only thing that I thought about in between the time that you and I talked was what I had said to other people. Again, it's still very hard for me to remember, you know, whether it was actually on the arm or the left back, but I just remember that when I talked to people, when I talked to my wife, when I talked to other people in the chorale, you know, I knew at that point that it was a shove.
Q. That was your impression at that point?
A. Mm-hmm (witness nods head affirmatively), that was my impression at that point.
Report of Proceedings at 91-92.[1]
Within a few days of the incident, Mrs. Turco reported the events to the Tacoma *736 Police, who investigated the complaint. The police interviewed Mrs. Turco and others, and prepared a report. Eventually, Mrs. Turco asked the police to stop the investigation. She left Judge Turco in December 1996. Judge Turco subsequently filed for dissolution, which occurred on February 4, 1998. The Turcos had been married for 38 years.
On August 27, 1997, the Commission on Judicial Conduct (Commission) filed a Statement of Charges against Judge Ralph G. Turco, alleging probable cause to believe Judge Turco violated Canons 1 and 2(A) of the Code of Judicial Conduct for having "intentionally struck or pushed his wife, causing her to fall to the floor" in a public setting on December 8, 1995. Statement of Charges at 2. Judge Turco contested the charges and a fact-finding hearing occurred before the Commission on February, 9, 1998. The Commission Decision, filed March 5, 1998, ordered discipline by censure and recommended to the Supreme Court removal from office. Commission Decision at 4. Judge Turco filed a timely Notice of Contest pursuant to DRJ 3(a), which we accepted.
A. COMMISSION DELAY IN BRINGING THE CHARGES
The first issue we must decide is whether the Commission's delay in bringing the charges against Judge Turco prejudiced his defense. The incident occurred on December 8, 1995. The Commission filed its charges on August 27, 1997. The Commission offers no reason for the delay; it argues, however, there was no prejudice. Judge Turco claims prejudice stemming from the fading of memories and his inability to investigate fairly.
In In re Disciplinary Proceeding Against Deming, 108 Wash.2d 82, 736 P.2d 639, 744 P.2d 340 (1987), we stated a judge has a right to a prompt resolution of charges by the Commission because a judge who violates the Code of Judicial Conduct should be swiftly disciplined and an innocent judge should be quickly exonerated. In that case, where events occurred in 1983 and 1984 but formal charges were not filed until July 1985, a dismissal of charges would be proper if prejudice could be demonstrated. Id. at 101, 736 P.2d 639. Thus, although the Commission might arguably have been dilatory in bringing charges against Judge Turco and Judge Deming, both judges must demonstrate prejudice from delay to merit dismissal. The Commission brought the charges against Judge Turco at least as quickly, and in some instances more quickly, than it filed charges against Judge Deming. Judge Deming was unable to show prejudice. Judge Turco similarly fails.
The crux of Judge Turco's delay argument is that Mrs. Turco's description of the incident became more egregious with the passage of time, and her memory of the events was colored negatively by her separation and pending divorce from the judge in the interim between the incident and the hearing. Also, Judge Turco claims Mr. Rake-Marona's memory faded, reducing his testimony to only what his remembered impression of the incident was, rather than the actual events of the incident.
Judge Turco's argument depends on his assumption a hearing closer in time to the incident would have produced testimony more favorable to him. His assumption is just that, however, an unsustainable supposition. He cannot know Mrs. Turco's testimony would have been more favorable to him had the hearing occurred closer in time to the incident. The passage of time and fading of memories may have actually been in Judge Turco's favor. Judge Turco argues the witnesses' varying descriptions of the occurrence shed doubt on whether he intended to shove Mrs. Turco, but it is equally possible had the hearing occurred relatively shortly after the incident, when memories were fresher, there may have been no discrepancy between the testimony of Mrs. Turco and Ms. Moran. Moreover, it may be that Mr. Rake-Marona's testimony would have established with greater specificity Judge Turco's intentional shove had that testimony occurred *737 closer in time to the event. Judge Turco's argument for dismissal based on delay is not persuasive; he fails to show prejudice.
B. JUDGE TURCO VIOLATED CANNONS 1 AND 2(A)
Next, we turn to the merits of the allegations against Judge Turco. Judicial discipline in Washington is governed by several constitutional directives. WASH. CONST. art. IV, § 31 establishes the Commission on Judicial Conduct, mandates our role in judicial discipline, and provides for the discipline of judges who violate the "rules of judicial conduct." Art. IV, § 31(3). Specifying the "rules of judicial conduct" in lower case allows for changes in the title of the Code of Judicial Conduct without resulting invalidation of the amendment. Thus, the Washington Constitution incorporates the Code of Judicial Conduct by reference.
In addition to art. IV, § 31, the state constitution permits removal of judges by the Legislature[2] or by impeachment.[3] No Washington judge has ever been impeached or removed by the Legislature.
The threshold question is whether Judge Turco's conduct comes within the ambit of the Commission's authority to discipline. But that question is, in fact, settled by the Constitution. Art. IV, § 31 mandates a judge may be disciplined for violation of rules of judicial conduct. The Code of Judicial Conduct, which we promulgate, pertains to judicial as well as extrajudicial behavior. Judge Turco was charged with violation of Canon 1 and Canon 2(A). Canon 1 reads:
An independent and honorable judiciary is indispensable to justice in our society. Judges should participate in establishing, maintaining, and enforcing high standards of judicial conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved. The provisions of this Code are to be construed and applied to further that objective.
Canon 2(A) reads: "Judges should respect and comply with the law and act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."
The official comment to Canon 1, which we adopted on June 23, 1995, sheds light on the intent of Canon 1:
Deference to the judgments and rulings of courts depends upon public confidence in the integrity and independence of judges. The integrity and independence of judges depends in turn on their acting without fear or favor. Although judges should be independent, they must comply with the law, including the provisions of this Code. Public confidence in the impartiality of the judiciary is maintained by the adherence of each judge to this responsibility. Conversely, violation of this Code diminishes public confidence in the judiciary and thereby does injury to the system of government under the law.
*738 The emphasis of the two quoted canons and the official commentary seems to be on judicial integrity and independence; that is, the ability of a judge to decide cases free of outside influences. We have held Canons 1 and 2(A) also apply to actions by a judge in a nonjudicial context. In re Disciplinary Proceeding Against Sanders, 135 Wash.2d 175, 955 P.2d 369 (1998) (extrajudicial comments considered subject to discipline, but Commission's recommendation reversed); In re Disciplinary Proceeding Against Niemi, 117 Wash.2d 817, 822, 820 P.2d 41 (1991) (dual status as pro tempore judge and state senator considered subject to discipline, but Commission's recommendation reversed); In re Disciplinary Proceeding Against Kaiser, 111 Wash.2d 275, 281-83, 759 P.2d 392 (1988) (statements made by judge during reelection campaign subject to discipline; Commission's recommendation upheld).
Niemi set forth "strong policy rationales for regulating non-judicial conduct":
(1) the avoidance of the appearance of partiality and favoritism;
(2) the need to maintain the public confidence in the judiciary; and
(3) the need to ensure that judges will not be distracted by nonjudicial activities.
Niemi, 117 Wash.2d at 821-22, 820 P.2d 41. Judge Turco argues his conduct in shoving his wife to the ground was not directly related to his official conduct and had nothing to do with avoiding partiality and favoritism. He asserts there was no compromise in public confidence because he was not charged with a crime and has not been convicted of any crime stemming from the incident. Br. of Resp't at 18-19. We decline to adopt the narrow focus of Canons 1 and 2(A) and Commission authority Judge Turco advances.
Judge Turco asks us to draw a bright line between the private conduct of a judge and the conduct of a judge acting in his or her official capacity. He argues that so long as a judge's private conduct does not amount to a crimethat is, the conduct is at worst merely tortiousthe judge should not be subject to discipline. We disagree.
We have never held a judge cannot be subject to discipline unless he or she commits a crime. Neither art. VI, § 31 nor our Code of Judicial Conduct makes a distinction between criminal acts and merely tortious acts in setting forth what conduct is unacceptable. Other courts have specifically rejected the bright line Judge Turco wishes us to draw. See, e.g., In re Lemoine, 692 So.2d 358, 360 (La.1997) ("violation of law is not a necessary prerequisite for finding misconduct warranting judicial discipline"); In re Dean, 246 Conn. 183, 717 A.2d 176, 183 (1998) (citing Lemoine).
Nevertheless, Judge Turco relies solely on a 1979 Pennsylvania case to support his position. In Matter of Dalessandro, 483 Pa. 431, 397 A.2d 743 (1979), the court reviewed the recommendation of Pennsylvania's Judicial Inquiry and Review Board (now called the Judicial Conduct Board), which like our Commission on Judicial Conduct is a body established by the state constitution to "receive and investigate complaints regarding judicial conduct." PA. CONST. art. V, § 18(a)(7). Judge Dalessandro was accused of several different instances of misconduct, among which was adultery. The Board found:
Respondent, married and living with his wife and child, maintained an open and notorious meretricious relationship with one Judith Walton, a married woman, which continued from the beginning of his judicial tenure until about November, 1976.
Dalessandro, 397 A.2d at 756. On one occasion, when visiting the Walton home, Judge Dalessandro slapped Judith Walton several times during an argument. Walton filed a criminal complaint against the judge, but the charge was eventually dismissed. Id. at 758. The Pennsylvania Supreme Court held this slapping incident involved, at worst, only tortious conduct rather than criminal conduct and therefore could not be a proper basis for discipline. Id. Judge Turco asserts Dalessandro stands for the proposition that if he beats his wife in some place other than open court in a manner that does not result in a criminal conviction, such conduct does not come under the purview of the Code of Judicial Conduct. Br. of Resp't at 21.
To the extent the Pennsylvania Supreme Court in Dalessandro intended to create a bright line test between extrajudicial criminal *739 conduct and extrajudicial noncriminal conduct with respect to the purview of judicial discipline, it repudiated any such notion some years later. In a case dealing with the impropriety of judges accepting small cash gifts from unions, the court appeared to go out of its way to say:
We reject the implication in the Matter of Dalessandro, 483 Pa. 431, 397 A.2d 743 (1979), that matters in one's personal life which legitimately reflect upon the jurist's professional integrity are immune from censure. The opinion in that appeal was joined by only two members of the Court and therefore does not represent a binding precedent.
Matter of Cunningham, 517 Pa. 417, 538 A.2d 473, 480 n. 12, appeal dismissed sub nom., White v. Judicial Inquiry and Review Bd., 488 U.S. 805, 109 S.Ct. 36, 102 L.Ed.2d 16 (1988). Moreover, Pennsylvania amended its constitutional provisions dealing with judicial discipline in 1993. PA. CONST. art. V, § 18(d), which was in effect when Dalessandro was decided, provided:
Under the procedure prescribed herein, any justice or judge may be suspended, removed from office or otherwise disciplined for violation of section seventeen of this article, misconduct in office, neglect of duty, failure to perform his duties, or conduct which prejudices the proper administration of justice or brings the judicial office into disrepute and may be retired for disability seriously interfering with the performance of his duties.
The 1993 amendment contains the following changes:
A justice, judge or justice of the peace may be suspended, removed from office or otherwise disciplined for conviction of a felony; violation of section 17 of this article; misconduct in office; neglect or failure to perform the duties of office or conduct which prejudices the proper administration of justice or brings the judicial office into disrepute, whether or not the conduct occurred while acting in a judicial capacity or is prohibited by law; or conduct in violation of a canon or rule prescribed by the Supreme Court.
PA. CONST. art. V, § 18(d)(1) (emphasis added). Thus, the people of Pennsylvania have cleared up any confusion Dalessandro may have caused with respect to the ambit of judicial discipline: it now includes conduct off the bench. At least two justices of the Pennsylvania Supreme Court think this new constitutional language "broadens the disciplinary charge and obligation of this court." Matter of Hasay, 666 A.2d 795, 802 (Pa.1995) (Burns, J., dissenting). In summary, the proposition Judge Turco relies upon from the Dalessandro case is no longer the law or the public policy of Pennsylvania. Judge Turco does not direct us to any other case to support his argument that only extrajudicial criminal conduct, as opposed to other extrajudicial conduct, is subject to discipline, and we can find none. We therefore adhere to our prior cases and reject Judge Turco's argument.
The question remains, however, how far the Code of Judicial Conduct extends to extrajudicial activities. Most would agree the public invests judges with particular esteem. We must meet a higher standard of behavior:
However, a judge is charged with the responsibility of conforming to a higher standard of personal behavior than the ordinary person. A judge's conduct of personal behavior must be "beyond reproach." Improper conduct which may be overlooked when committed by the ordinary person, or even a lawyer, cannot be overlooked when committed by a judge. By accepting his office, a judge undertakes to conduct himself in both his official and personal behavior in accordance with the highest standard that society can expect. As stated in Canon 34, "In every particular his conduct should be above reproach."
Cincinnati Bar Ass'n v. Heitzler, 32 Ohio St.2d 214, 291 N.E.2d 477, 482 (1972), cert. denied, 411 U.S. 967, 93 S.Ct. 2149, 36 L.Ed.2d 687 (1973).
In a civilized society, members of the judiciary are significant public figures whose authority necessarily reaches all points within their respective jurisdiction, if not beyond.... A citizen who serves as a member of the judiciary of the State of *740 Texas is among a chosen few who no longer enjoys the role of an "ordinary" citizen. It is for that reason, among others, that a judge who is a standard-bearer of fairness and impartiality in our society is no longer addressed as Ms., Mrs., or Mr., but rather as "Your Honor."
In re Bar, ___ S.W.2d ___, No. 67, 1998 WL 58975, at # 2, # 29 (Tex.Rev.Trib. Feb.13, 1998).
A judge is required to conduct himself under standards which are much higher than those required of an attorney. Although we use the same measure of proof in considering grievance procedure against a judge as that used against a lawyer, facts requiring the reprimand or removal of a judge may not in all circumstances require reprimand or disbarment of an attorney.
In re LaMotte, 341 So.2d 513, 517 (Fla.1977).
The purpose of sanctions in cases of judicial discipline is to preserve the integrity and independence of the judiciary and to restore and reaffirm public confidence in the administration of justice. The discipline we impose must be designed to announce publicly our recognition that there has been misconduct; it must be sufficient to deter respondent from again engaging in such conduct; and it must discourage others from engaging in similar conduct in the future. Thus, we discipline a judge not for purposes of vengeance or retribution, but to instruct the public and all judges, ourselves included, of the importance of the function performed by judges in a free society. We discipline a judge to reassure the public that judicial misconduct is neither permitted nor condoned.
In re Kneifl, 217 Neb. 472, 351 N.W.2d 693, 700 (1984).
In addressing extrajudicial behavior of judges, our authority to discipline, and that of the Commission, are not unlimited. We believe that authority is confined to those situations for which there is an articulable nexus between the extrajudicial conduct and the judge's duties. While certainly there is some extrajudicial conduct that is reprehensible, not all such conduct reflects adversely on the judiciary or a particular judge's ability to decide cases fairly in a way that implicates our supervisory powers. All judges in Washington are either elected or appointed by elected officials, and are thus subject to popular opprobrium and election redress for conduct the public considers inappropriate, reprehensible, or unseemly for those who would be a judge among them. For instance, if a judge were a nightly visitor to a gambling casino and known to be a heavy bettor, some in the community might think such activity unbefitting and unacceptable for a judge. That judge may be ultimately called to account for that behavior at the next election, but unless there were a showing that behavior affected the judge's integrity or ability to judge impartiallythat is, unless an articulable nexus were shown between the judge's immoderate gambling and performance of judicial dutiesthere would be no basis for discipline. The ultimate discipline, if any, for such behavior would emerge at the next election. Both the Commission on Judicial Conduct and this Court must, therefore, take care to respect and observe the people's categorical right to choose their own judges, and to avoid interfering with that right except for manifest violations of the Code of Judicial Conduct. Here, we conclude from our independent evaluation of the record that Judge Turco's conduct did adversely affect public confidence in the judiciary, and was therefore subject to discipline by the Commission.
In considering the Commission's specific findings of fact and conclusions of law in this case, we review the Commission's findings and conclusions de novo.[4] This de *741 novo review does not mean that we hold a new evidentiary hearing or that the judge and Commission are free to build a factual record anew upon our review. Rather, de novo review means we are not bound by the Commission's findings and conclusions. We must independently evaluate the evidence in the Commission's record to determine if the judge violated the Code and to determine the proper sanction.[5] In so doing, we necessarily give "considerable weight" to the credibility determinations of the Commission, as the body that had the opportunity directly to observe the witnesses and their demeanor. Deming, 108 Wash.2d at 110, 736 P.2d 639. We also give "serious consideration" to the Commission's recommendation on the appropriate sanction. In re Disciplinary Proceeding Against Ritchie, 123 Wash.2d 725, 731, 870 P.2d 967 (1994).
In reviewing the specific findings here, we are mindful the Commission bore the burden of proving factual findings by clear, cogent, and convincing evidence. Sanders, 135 Wash.2d at 181, 955 P.2d 369. The Commission met its burden here.
The central finding of the Commission was that Judge Turco "intentionally shoved or pushed his wife, causing her to fall to the floor." Finding of Fact No. 6; Commission Decision at 2. Judge Turco correctly notes both that if the contact with his wife was not intentional, there was no misconduct, and the Commission's burden was to prove intentional conduct by clear, cogent, and convincing evidence.[6] He argues strenuously the testimony of Mrs. Turco and the two witnesses was both contradictory and equivocal, and the Commission failed to meet the burden of proof. The judge's arguments emphasize minor technical differences in the witnesses' descriptions of the incident. The Commission simply relies on its finding that Judge Turco's "testimony characterizing the contact and fall as accidental was not credible." Finding of Fact No. 8; Commission Decision at 3.
It is undisputed Judge Turco was angry at his wife on the night of the madrigal feast. He exchanged angry words with her. He had physical contact with her and she fell. He did not help her to her feet. He did not apologize.
A fair reading of the hearing transcript leaves the impression all three witnesses were quite certain Judge Turco intentionally shoved Mrs. Turco, even though there are *742 differences in their recollections of precisely how it occurred. Mrs. Turco in particular seems adamant she did not simply trip or lose her balance. Here, the transcript gives little reason to disregard the testimony of Mrs. Turco and the two witnesses and to accept Judge Turco's testimony that his contact with Mrs. Turco was only accidental. Perhaps the greatest single reason not to believe Judge Turco's defense is his own testimony that he neither helped Mrs. Turco to her feet nor apologized to her. A natural reaction to knocking even a complete stranger to her knees accidentally would be to help her up and at the very least offer some apology. Instead of doing either, Judge Turco turned and left the church. He soon returned and had dinner at the Turco family table.
The Commission met its burden of proof that Judge Turco intentionally pushed his wife to the ground and thereby violated Canons 1 and 2(A). The burden of proof by clear, cogent, and convincing evidence can be met, as here, even where the evidence is in dispute. Deming, 108 Wash.2d at 109, 736 P.2d 639. Indeed, it may be met by uncorroborated evidence. Id.
Having concluded from our independent evaluation of the facts Judge Turco intentionally pushed his wife to the ground, we next must consider whether this act bore an articulable nexus to his duties as a judge. We hold that it did.
The Tacoma Municipal Code (TMC) contains a chapter on domestic violence. TMC 8.105.010 states the intention of the city to enforce Washington's domestic violence laws, incorporating by reference RCW chapters 10.99, 26.50, 26.09, and 26.26. When a Tacoma police officer responds to a domestic violence call and has probable cause to believe a domestic violence crime has been committed, the officer must arrest the alleged perpetrator. TMC 8.105.030(C)(1). This results in a large volume of domestic violence cases appearing in Tacoma Municipal Court.
Judge Turco's act of pushing his wife to the ground raises substantial questions about his ability to sit in judgment of those accused of domestic violence. Fearful victims of domestic violence would certainly be justified in questioning whether a judge who has demonstrated so little control of his own emotions and so little restraint as to allow himself to assault his own wife, can rule impartially and wisely in the emotion-charged arena of domestic violence. This was particularly true when Judge Turco had been disciplined only a week before the incident in question for remarks demonstrating insensitivity to victims of domestic violence.
We do not believe that judges in Washington are free under Canon 1 or 2(A) to behave in such a fashion, thereby undercutting the integrity of our high office and creating concern for impartiality. A judge engaging in what is arguably an act of domestic violence, an act made even more egregious by its commission in a public setting so shortly following discipline for insensitivity to victims of domestic violence, violates the directive of Canons 1 and 2(A).
C. SANCTION FOR JUDGE TURCO'S CONDUCT
We turn finally to the proper sanction for Judge Turco's violation of Canons 1 and 2(A). RCW 2.64.055 provides for progressive levels of discipline by the Commission and the Supreme Court against a judge who has engaged in misconduct. Censure is defined in RCW 2.64.010(2) as:
[A] written action of the commission that requires a judge or justice to appear personally before the commission, and that finds that conduct of the judge or justice violates a rule of judicial conduct, detrimentally affects the integrity of the judiciary, undermines the public confidence in the administration of justice, and may or may not require a recommendation to the supreme court that the judge or justice be suspended or removed. A censure shall include a requirement that the judge or justice follow a specified corrective course of action.
By contrast, only we may suspend or remove a judge. Suspension is merited if we find "the conduct of a judge or justice is a violation of a rule of judicial conduct and seriously impairs the integrity of the judiciary and substantially undermines the public confidence *743 in the administration of justice to such a degree the judge or justice should be relieved of the duties of his or her office by the court for a specified period of time, as determined by the court." RCW 2.64.010(8). Similarly, removal is warranted if we find "the conduct of a judge or justice is a violation of a rule of judicial conduct and seriously impairs the integrity of the judiciary and substantially undermines the public confidence in the administration of justice to such a degree that the judge or justice should be relieved of all duties of his or her office." RCW 2.64.010(5). The Commission here recommended Judge Turco's removal.
Judge Turco asserts removal is too severe a penalty for his conduct and contends censure is the only appropriate sanction. He notes the two judicial discipline cases in which we ordered removal of a judge from the bench, Deming and Ritchie, involved far more egregious circumstances.
Judge Deming was charged with a broad spectrum of misconduct: (a) having a personal relationship with a probation department employee; (b) sexual harassment of female employees; (c) threats to the director of the probation department; and (d) aberrant and unstable courtroom behavior. We concluded: "His actions were unprofessional, demeaning and embarrassing to the involuntary participants, who suffered varying degrees of anger, anguish, intimidation and humiliation." Deming, 108 Wash.2d at 117, 736 P.2d 639. In Ritchie, we ordered removal of Judge Ritchie after recounting his pervasive misuse of government travel funds over a five-year period involving multiple conversions of public funds for personal benefit.
In those cases, we established a set of criteria to determine if removal of a judge was the proper sanction:
1. "Whether the misconduct is an isolated instance or evidenced a pattern of conduct." Judge Turco claims shoving his wife was an isolated instance. The Commission argues it was part of a pattern of conduct exhibiting disregard for domestic violence.
2. "The nature, extent and frequency of occurrence of the acts of misconduct." Judge Turco again notes the alleged act of misconduct occurred only once.
3. "Whether the misconduct occurred in or out of the courtroom." The conduct occurred out of court.
4. "Whether the misconduct occurred in the judge's official capacity or in his private life." Judge Turco asserts the misconduct occurred in his private life, outside the courtroom, and therefore ought not be the basis of removal or suspension. The Commission urges Judge Turco's misconduct, even if it occurred outside court and in his private life, reflects adversely on his fitness for hearing and deciding domestic violence cases, when considered in connection with his written admonishment.
5. "Whether the judge has acknowledged or recognized that the acts occurred." Judge Turco continues to deny he shoved his wife intentionally. He claims the contact was wholly accidental. His failure at the time of the incident to help his wife up, or to apologize to her, combined with his continued lack of contrition, militate against him under this criterion.
6. "Whether the judge has evidenced an effort to change or modify his conduct." The judge admits that whatever happened is not likely to occur again now that he and his wife are divorced. He notes, however, that he has not been disciplined since December 8, 1995. Again, his argument displays a decided lack of contrition.
7. "The length of service on the bench." Judge Turco ascended to the bench in 1991, and has served since that time.
8. "Whether there have been prior complaints about this judge." In addition to the written admonition discussed above, Judge Turco stipulated to an earlier censure for flipping a coin in open court to decide a disputed traffic violation. The call was against the defendant, and Judge Turco fined him $20. Thus, Judge Turco had two instances of discipline prior to the current proceeding. Judge Turco acknowledges these prior cases count against him, but argues they should amount to no more than a censure rather than removal or suspension.
9. "The effect the misconduct has upon the integrity of and respect for the judiciary." *744 Judge Turco was asked at the hearing, "Would it instill confidence in the judiciary knowing that someone in your position could do that in public or private?" He answered, "I don't think anyif they find it's an assault, I don't think that instills confidence in anybody about anything period." Report of Proceedings at 123. This criterion presents the core question in this case: does Judge Turco's conduct, taken as a whole, reflect adversely on the public's respect for the judiciary, especially taking into consideration the major role municipal court judges play in domestic violence cases?
10. "The extent to which the judge exploited his position to satisfy personal desires." This criterion is not a factor here.
Taking the Deming Ritchie criteria into account, we agree with Judge Turco that the recommended sanction of his removal from the bench was an excessive sanction. We are mindful of the belief we articulated in Kaiser, 111 Wash.2d at 290, 759 P.2d 392, that the people's choice in judicial elections should not be "lightly set aside":
If a judge flagrantly and intentionally violates his oath of office or misuses his power in performing his duties this court should fulfill its obligation to remove that judge from office. That sanction, however, should be sparingly applied.
At the same time, a sanction limited to public disapproval of Judge Turco's boorish behavior is plainly insufficient. Only one week before he was involved in the incident in question here, Judge Turco stipulated to a written admonishment. In that stipulation, Judge Turco admitted to saying to a defendant whom he had just found guilty of assault in the fourth degree, "[Y]ou didn't need to bite her. Maybe you needed to boot her in the rear end, but you didn't need to bite her." In another incident of fourth degree assault, Judge Turco said to the defendant,
"[F]ifty years ago I suppose they would have given you an award rather than ... what we're doing now." In yet another incident in open court, after Judge Turco dismissed the defendant when the victim failed to appear, he said to a city attorney,
[M]y opinion is ... that the police do 95% of the work when they separate the parties, so that takes care of 95% of the problem. You know, all we're doing is slapping someone after the police have remedied the situation. But, so be it. So I mean there's nothing to get excited about dismissing these cases.
As the Commission concludes, "Judge Turco is not subject to discipline for an isolated incident of violence against his wife, but in the context of his earlier admonishment for admitted comments on the bench reflecting a lack of concern for domestic violence and its victims." Br. of Commission at 25. The Commission observes a significant part of the Tacoma Municipal Court's workload results from assaults related to domestic violence. Id. at 1-2.
We agree with the Commission's concerns regarding the timing of this matter and the fact Judge Turco sits on a bench that hears numerous domestic violence cases. Victims of domestic violence can take little consolation in presenting their cases to a judge who has shown unacceptable insensitivity to domestic violence by his own words and deeds.[7] Judge Turco's conduct reflected *745 adversely upon the integrity of the judiciary and undermined public confidence in the court system. RCW 2.64.010(8).
We, therefore, impose the following sanction on Judge Ralph G. Turco: Judge Turco shall be publicly censured for his misconduct and suspended from the Tacoma Municipal Court bench without compensation from October 21, 1998, through the remainder of his term in office.[8] Judge Turco may not serve in any future judicial capacity until he has completed a domestic violence program as described in RCW 26.50.150 satisfactory to the Commission.

CONCLUSION
The Washington Constitution mandates judicial discipline and prescribes our role in such discipline. While this case involved extrajudicial behavior by a judge, such out-of-court behavior may subject a judge to discipline if the behavior violates the Code of Judicial Conduct.
In this case, the evidence supports the Commission's finding that Judge Turco intentionally pushed or shoved his wife to her knees in a public place. Such conduct constitutes a violation of Canons 1 and 2(A). In view of Judge Turco's history of insensitivity to domestic violence and his own actions in this case, we censure his conduct, suspend him from service on the bench without compensation, and order him to complete a domestic violence program as described in RCW 26.50.150 before he may serve in any future judicial capacity.
DURHAM, SMITH, MADSEN, JJ., and DOLLIVER, J.P.T., KENNEDY, J.P.T. and SHIELDS, J.P.T., concur.
SANDERS, J. (dissenting).
Although the majority characterizes the issue as "Did Judge Turco violate Canons 1 and 2(A) by his extrajudicial conduct of pushing or shoving his wife in a public setting?," Majority at 733, I am persuaded the Judicial Conduct Commission more nearly sets forth the raison d'etre for this proceeding:
Judge Turco is not subject to discipline for an isolated incident of violence against his wife, but in the context of his earlier admonishment for admitted comments on the bench reflecting a lack of concern for domestic violence and its victims.
Br. of Comm. on Judicial Conduct at 25.[1] Although the majority devotes considerable effort to parse the facts with respect to whether Judge Turco's admitted physical contact with his wife was intended to harm, a proposition I believe was proved with less than the requisite certainty, the majority's conclusion that this alleged "act bore an articulable nexus to his duties as a judge," Majority at 742, is even more troublesome. Here the majority appears to base its finding of nexus not upon any facts connecting the alleged act with performance of a judicial duty but rather upon a perceived "insensitivity to victims of domestic violence." Majority at 742. I would venture, however, such a slender thread does not adequately tie the personal deed to the judicial duty and the relationship, if any, is better judged by the electorate than this court. If public confidence in this judge is the question, his popular election to the bench is the answer.
But at the threshold I would agree with the majority that before we can reach that question we must first determine, based upon clear, cogent, and convincing evidence, that Judge Turco acted intentionally to harm his wife by striking or pushing her, for, if he did not, the inquiry need go no further. Majority *746 at 733. This requires a more detailed de novo review of the record than that performed by the majority.
A. De Novo Review of the Record
1. De Novo Standard of Review Our state constitution mandates commission findings of judicial misconduct stand the test of de novo review by this court. Wash. Const. art. IV, § 31(6). The de novo burden in a judicial discipline case rests heavily on the accuser to prove the alleged misconduct by clear, cogent, and convincing evidence. In re Disciplinary Proceeding against Sanders, 135 Wash.2d 175, 181, 955 P.2d 369 (1998); In re Disciplinary Proceeding against Kaiser, 111 Wash.2d 275, 279, 759 P.2d 392 (1988). This clear, cogent, and convincing standard "is a high one, requiring `that the trier of fact be convinced that the fact in issue is "highly probable."'" Queen City Farms, Inc. v. Central Nat'l Ins. Co., 124 Wash.2d 536, 126 Wash.2d 50, 97, 882 P.2d 703, 891 P.2d 718 (1994) (quoting Colonial Imports, Inc. v. Carlton Northwest, Inc., 121 Wash.2d 726, 735, 853 P.2d 913 (1993)). To satisfy this standard the evidence must be "weightier and more convincing than a preponderance of the evidence....", In re Disciplinary Proceeding against Deming, 108 Wash.2d 82, 109, 736 P.2d 639, 744 P.2d 340 (1987), and any finding of violation must be supported by "direct evidence of misconduct," In re Disciplinary Proceeding against Niemi, 117 Wash.2d 817, 822, 820 P.2d 41 (1991). This is to say a simple assertion that particular conduct undermines confidence in the judiciary is not enough. Id.
When applying this standard we must give "`members of the judiciary every reasonable degree of latitude, barring activities only where they do measurable damage to the court's dignity, available time and energy, or appearance of impartiality.'" Niemi, 117 Wash.2d at 824, 820 P.2d 41 (quoting Jeffrey M. Shaman et al., Judicial Conduct and Ethics § 10.07, at 279 (1990)). Such a high standard of proof is required because professional disciplinary proceedings are quasi-criminal in nature and the judge's professional reputation is at stake. See Deming, 108 Wash.2d at 95, 736 P.2d 639 ("Over the centuries the intangible yet precious value of one's reputation has been recognized.").
Although the majority correctly notes, "We must independently evaluate the evidence in the Commission's record to determine if the judge violated the Code," it qualifies the constitutional standard by adding, "[i]n so doing, we necessarily give `considerable weight' to the credibility determinations of the Commission...." Majority at 740-741.
While there is ample precedent to support this view, not only do I find no hint of this deference in the constitutional text, but I must note the reason for this qualification is also undercut by the court's recent holding in In re Disciplinary Proceeding against Heard, 136 Wash.2d 405, 963 P.2d 818 (1998) which affirmed the imposition of professional discipline by the bar's disciplinary board notwithstanding incompatible factual findings made by the bar's hearing examiner, who uniquely heard the evidence firsthand. Thus in Heard we construed the obligation of de novo review quite literally.
In any event, we have always emphasized when we are required to review a record de novo, this task, by nature, cannot be performed indirectly by delegation: "The court cannot delegate its fact-finding responsibility and de novo review of disciplinary proceedings is required by this court." Kaiser, 111 Wash.2d at 279, 759 P.2d 392. See also Deming, 108 Wash.2d at 88, 736 P.2d 639 ("`This court's constitutional responsibility [of de novo review] cannot be abandoned by the delegation of the fact-finding power to an administrative agency or the masters.'" (quoting In re Nowell, 293 N.C. 235, 246, 237 S.E.2d 246 (1977))).
2. Facts in Record Regarding Intent to Harm
Without dispute on the evening of December 8, 1995 Judge Turco and his wife, Pat, attended a madrigal feast at a Tacoma church. During an argument in the vestibule Judge Turco's hand contacted Mrs. Turco's back, after which she fell forward. What is disputed is whether the touching was accidental and/or without malevolent intent, as *747 Judge Turco contends, Report of Proceedings (RP) at 116, or an intentional effort to harm, as the Commission alleges. In re Ralph G. Turco, No. 97-2451-F-66, Commission Decision at 2, Findings of Fact ¶ 6 ("Commission Decision").
The Commission heard four witnesses to the event: Judge Turco; Mrs. Turco; Mrs. Turco's "closest friend," Joann Moran (RP at 62); and Mark Rake-Marona, the only person who could credibly be described as neutral, acting that night as a "greeter" to the event. RP at 75.
The majority writes, "A fair reading of the hearing transcript leaves the impression all three witnesses were quite certain Judge Turco intentionally shoved Mrs. Turco...." Majority at 741. However, even accepting, arguendo, this impression of the verbatim hearing transcript, our de novo review is not limited to the verbatim transcript, as there is more to the record than that. Review of the entire record paints a fairer picture.
We begin by noting the events described took place on the evening of December 8, 1995; however, the Commission hearing took place on February 9, 1998, more than two years later![2] Swift adjudication in matters of judicial conduct serves both the interest of the accused and society as it is human experience that memories fade and change over time and "[a] judge who is violating the Code of Judicial Conduct should be disciplined as soon as possible so that the inappropriate practice will be stopped. A judge who is unfairly accused has a right to a prompt resolution of the allegations...." Deming, 108 Wash.2d at 101, 736 P.2d 639. Were it proven the delay caused actual prejudice the law would properly require dismissal of the charges, id.; however, short of that we must at least factor in the significant time delay when weighing the strength of the testimonial evidence.
Here Judge Turco argues the extensive delay worked to his disfavor in two respects: (1) the fading memories of the witnesses adversely affected their credibility; and (2) the increasing acrimony between himself and his wife during the two years in question manifested itself in an increasing level of hostility toward the judge by both Mrs. Turco and her closest friend, Joann Moran, lending a greater motive to exaggerate or falsify as time passed.
The majority dismisses this concern by claiming, "The passage of time and fading of memories may have actually been in Judge Turco's favor," Majority at 736, speculating the testimony of the witnesses against Judge Turco may have been even more damning closer to the event. But the burden is always on the accuser, and Judge Turco is ultimately correct to assert that stale proof is presumptively the enemy of truth. See Stenberg v. Pacific Power & Light Co., 104 Wash.2d 710, 714, 709 P.2d 793 (1985) ("Our [limitation statute] policy is one of repose; the goals are to eliminate the fears and burdens of threatened litigation and to protect a defendant against stale claims.").
More importantly, the full record before this court, a record beyond that before the Commission, demonstrates Judge Turco's fears that time eroded the truth to his disfavor were certainly not without foundation.
The testimony of Rake-Marona shows just how tenuous memory can be. For example, when asked if he helped Mrs. Turco up, he responded, "I think I did. I don't recall. I mean, I don't know if I'm filling in to be chivalrous or not, but I would like think that if I saw her fall, that I would have helped her up." RP at 80. In fact, the other three witnesses to the event all testified that Mrs. Turco rose unassisted. RP at 37 (Mrs. Turco); 59 (Ms. Moran); 115 (Judge Turco).
Rake-Marona's testimony regarding the actual contact between Judge Turco and Mrs. Turco also appears to be "filled in." When asked if the incident could be consistent with either an accidental or intentional shove, Rake-Marona stated, "[I]t's hard for me to visualize exactly what it looked like. I remember more than anything the shock of seeing it happen and, you know, what I told people was I saw someone, I saw a man shove his wife, and so I really feel like it was intentional." RP at 92 (emphasis added).
*748 When asked on cross-examination if he had earlier said that the shove could have been accidental, he replied, "I did, and, again, the only thing that I thought about [since then]... was what I had said to other people... I just remember that when I talked to people... I knew at that point that it was a shove." Id. (emphasis added). In other words, the testimony of the one impartial witness to the incident was not based on what he remembered, but rather upon what he had said to other people. As he told Ms. Keller of the Commission, regarding the intentional nature of the contact, `The fact that it was two years ago makes it hard to recall precisely what happened." RP at 94-95.
Judge Turco's allegations regarding the increasingly inflammatory nature of Mrs. Turco and Ms. Moran's testimony as time passed from the event is also supported by the record. There is much evidence of deterioration in the relationship between the Turcos during the two-year hiatus between the event and the hearing. The record shows the night of the incident and day of the Commission testimony were separated by the acrimonious dissolution of the Turco's marriage which finally ended just days before the much-delayed hearing.
The complete record contains not only the transcript of that post-divorce hearing, but also a series of nearly contemporaneous police reports and a written statement of Ms. Moran made within days, as opposed to years, of the event. Ex. 17. Comparison of these reports with the later testimony of Mrs. Turco and Ms. Moran raises important questions of credibility which this court must weigh as part of its de novo review. At the hearing Mrs. Turco testified to the injuries she sustained on the evening in question and the treatment she applied in the days immediately following. RP at 27-28. Yet immediately after supposedly undergoing medical treatment she informed police that she suffered no injury at all.
Very significantly Mrs. Turco also claimed at the Commission hearing Judge Turco stated immediately prior to the alleged shoving, "Nobody talks to me like that and gets away with it." RP at 23. And, for those on the Commission who might have missed its import, she added, "and he was rightI could hear him and he struck me and I fell to the floor." Id.
Ms. Moran also testified to this damning statement. RP at 59. When asked by Judge Howard what led her to conclude that Judge Turco intentionally shoved his wife, she responded, "It was obvious that he was very upset and said, `Nobody is going to talk to me like that.'" RP at 69.
One can easily imagine how shocked Mrs. Turco and Ms. Moran must have been by the statement, if it was in fact uttered as alleged. Certainly the majority was impressed with its angeranger indicative of an intentional strikingciting both Mrs. Turco's and Ms. Moran's use of this phrase, Majority at 733 and 734. The Commission was similarly impressed as it offered this statement as direct proof of the judge's alleged malevolent intent. Commission Decision at 2, Findings of Fact ¶ 6 ("After saying: `No one speaks to me like that and gets by with it,' Respondent intentionally shoved or pushed his wife, causing her to fall to the floor.").
Yet Rake-Marona never corroborated this statement, nor told it to any of his friends, or to the detective who originally investigated the incident and who spoke with him within 12 days of the event.[3] Nor was it repeated by Mrs. Turco in her statement to the police on December 18, 1995, although this statement purports to contain her complete recapitulation of the evening's events and dialogue. And even Ms. Moran, who recounted in great detail everything she purportedly saw and heard in her written statement to the police dated December 20, 1995, did not mention the statement at issue:
Pat asked Ralph, "Do you have the tickets?" Ralph: "Yes. I just got them from Milton (son). What took you so long in getting here?" Pat: "I had to carry all those things from the car. I didn't get any help from you." I was standing between *749 Ralph and Pat, Ralph being on my left side, Pat on my right.
After this comment, Ralph instantly reachedd [sic] across with his right hand and pushed Pat's left shoulder and she fell to the floor.
Ex. 17 (Statement of Joanne Moran (Dec. 20, 1995)).
Weighing witness credibility from the record, the majority also claims, "Perhaps the greatest single reason not to believe Judge Turco's defense is his own testimony that he neither helped Mrs. Turco to her feet nor apologized to her." Majority at 742. Yet a review of the entire record rendered Judge Turco's behavior thoroughly explicable. First, the evidence shows that Mrs. Turco arose without assistance. RP at 37, 59. Second, as Judge Turco described himself as "shocked" when he saw his wife fall, RP at 115, his decision to walk away from this unexpected scene may not have been the best or only alternative in hindsight, but hardly demonstrates that intent which could be inferred had he then initiated further physical contact or even exchanged words. His actions at the time are therefore consistent with his explanation at the hearing.
After her fall Mrs. Turco pursued the judge, asking him to accompany her into dinner, which tells us something in itself of the importance she ascribed to the incident at the time. In re Turco, No. 97-2451-F-66, Deposition of Frances A. (Pat) Turco at 45 (Deposition). He obliged, although she then sat at the opposite end of the table and did not speak with the judge that night, leaving after dinner to stay with a relative of the judge's. Deposition at 47-48; RP at 27. It was five days before she returned home, RP at 28, and over a year before Mrs. Turco even mentioned the incident to the judge. RP at 117. Both her son Milton and his spouse, Jody, were present at the madrigal feast. Neither saw any evidence that Mrs. Turco was injured, upset, or behaving in any manner out of the ordinary at the event. In re Turco, JD No. 13, Judge's Mot. and Mem. re Submission of Additional Evidence, Ex. B (Aff. of Milton Turco at 2); RP at 106.
Judge Turco also moved and received permission from this court to submit additional evidence pursuant to DRJ 7. In re Turco, JD No. 13, Order (July 10, 1998). Contained therein are affidavits from the four adult Turco childrenas well as a petition signed by 141 attorneys very supportive of Judge Turcoaffidavits not available to the Commission. They are helpful to Turco.
All four children swore that they had never seen any abusive behavior by Judge Turco in their decades at home, behavior they insisted would have been obvious to them. Ex. B. (Affidavit of Milton Turco at 1; Affidavit of Michael Turco at 1; Affidavit of Theresa Turco at 1; Affidavit of Patrick Turco at 1). Three of the children swore Mrs. Turco intended to ruin Judge Turco by allegations of abuse. Ex. B (Affidavit of Milton Turco at 1; Affidavit of Michael Turco at 2-3; Affidavit of Theresa Turco at 1). According to daughter Theresa, Mrs. Turco had told her the complaint was "an opening for her [Mrs. Turco]" that she could use to her advantage. Ex. B (Affidavit of Theresa Turco at 1-2). Theresa Turco also stated, "It is well known amongst our friends and the children that my mother is prone to exaggeration and at times outright untruthful [sic]." Id. at 2. One son stated, "My mother's idea of abuse is when someone does not follow her ideas or dictates .... my mother was attempting to create an incident that would justify an imminent divorce for her failed marriage without her taking any responsibility." Ex. B (Affidavit of Michael Turco at 3). Another son attested his mother "wanted us to support her position that he [Judge Turco] was abusive to her in order that she might get a [sic] excellent settlement in the divorce." Ex. B (Affidavit of Milton Turco at 2).
I therefore must conclude, based on a de novo review of all the evidence before this court, it has not been established by clear, cogent, and convincing evidence that Judge Turco intended any harm to his wife. By the majority's analysis, if intent to harm is not proven the charges against the judge must be dismissed. The case should end there but the majority's error does not.
B. Proper Application of Canons 1 and 2(A)
This case marks a radical departure in judicial disciplinary proceedings. This is not *750 about on-bench versus off-bench judicially related behavior. Rather, it is an accusation of a single, isolated act of tortious behavior (whether the act be intentional or negligent), having nothing in itself to do with any judicial function. No previous case in this court has found judicial misconduct in any situation remotely resembling the facts here, even accepting the erroneous conclusion that Judge Turco acted with intent to harm.
Canon 1 commands judges to personally observe high standards of judicial conduct. Canon 1 by itself however merely "sets the conceptual framework for the constraints on judges," Sanders, 135 Wash.2d at 183, 955 P.2d 369, and is not a substantive constraint in itself. See also In re Hey, 192 W.Va. 221, 452 S.E.2d 24, 31 (1994). Canon 2(A) requires judges to respect and comply with the law and act at all times in a manner promoting public confidence in the integrity and impartiality of the judiciary. But surely the public must know, and we must tell them if they don't, not every private act by a judicial office-holder bears directly on his professional function. This is, after all, a land governed by laws, not men, Marbury v. Madison, 5 U.S. 137, 163, 1 Cranch 137, 2 L.Ed. 60 (1803), and hopefully the rule of law is not so tenuous that our respect for its institutions can be defeated by recognition that those who work within them are sometimes weak and fallible, which is to saythey are human.
While Canon 2(A) states judges should "comply with the law," there was no criminal conviction here, nor apparently was there adequate probable cause, or at least likelihood of success, to persuade any prosecutorial authority to proceed. Rather the majority's action rests on the more general requirement that judges should act "in a manner that promotes public confidence in the integrity and impartiality of the judiciary," Canon 2(A), and its view that Judge Turco's conduct adversely affected "public confidence in the judiciary." Majority at 740. Greater care is mandated in such murky waters as we should be careful not to impose impossible standards which allow the system to survive only through sparing and inconsistent application. Moreover, we must understand the important role of the electorate which selected its judge and not transgress upon its prerogative to judge the candidate by less objective political standards. And I agree with the majority that our authority to discipline is not unlimited. Rather, there must be "an articulable nexus between the extrajudicial conduct and the judge's duties," Majority at 740, lest we transform a judicial code of conduct into a personal one.
Nor is this to say a judge cannot violate the canons off the bench by engaging in conduct which may be reasonably imputed to the judicial function at issue. For example a judge who accepts a bribe in a restaurant or holds a press conference to announce the verdict in a case before the trial begins strikes a blow against a fundamental premise of our justice system. It is equally obvious that a judge who abuses his office for personal gain is properly subject to sanction for betrayal of the public trust. See In re Disciplinary Proceeding against Ritchie, 123 Wash.2d 725, 735-36, 870 P.2d 967 (1994) (upholding sanction of judge who consistently in his personal and official capacity misconstrued personal travel as official for purposes of state reimbursement). But that is not the situation here.
The majority attempts to precedentially support its discipline of Judge Turco based upon Sanders; Niemi, 117 Wash.2d at 820, 820 P.2d 41; and Kaiser, 111 Wash.2d at 283, 759 P.2d 392; however, I find no solace for sanction there. Majority at 738.
In In re Sanders the court held the discipline was inappropriate where the judge's speech was not an implied or express promise to decide cases in a particular way nor evidenced an inability to impartially follow the law. Sanders, 135 Wash.2d at 190, 955 P.2d 369. But in Sanders, at least, the inquiry proceeded from words measured and intentionally spoken; whereas, in all fairness, Judge Turco's actions were never so defended by the judge as intentional, much less appropriate by his own standards.
In Niemi, we reversed a Commission conclusion that dual service as a pro tem judge and as a member of the State Legislature "undermines the public's confidence in the integrity, impartiality and independence of *751 the judiciary in violation of Canons 1 and 2(A)." Niemi, 117 Wash.2d at 820, 820 P.2d 41. Although the Code of Judicial Conduct expressly prohibits various species of partisan involvement, and the subject of that inquiry was overtly partisan in her public charge, we inferred no discredit from this fact alone.
In the third case we disapproved campaign statements by a judge that "suggested that the state would not get a fair trial" in his opponent's courtroom. Kaiser, 111 Wash.2d at 283, 759 P.2d 392. This was an example of holding one accountable for his public pronouncements on a subject at the core of the judicial function.
All three cases therefore dealt with alleged concerns over judicial impartiality, as does the case at bar. However, as these cases attest, judges are not to be found wanting for lack of impartiality upon mere nuance or arguable implication. In re Disciplinary Proceeding against Stoker, 118 Wash.2d 782, 799, 827 P.2d 986 (1992). Nevertheless, that is precisely the basis upon which the majority makes its claim: If Judge Turco physically harmed his wife, it is reasonable to believe he cannot be fair to others who may appear in his court on matters involving domestic violence. ("Fearful victims of domestic violence would certainly be justified in questioning whether a judge who has demonstrated so little control of his own emotions and so little restraint as to allow himself to assault his own wife, can rule impartially and wisely in the emotion-charged arena of domestic violence." Majority at 742.)
I beg to differ. There is no more inference arising from these facts that Judge Turco would be unfair to the prosecution of domestic abuse cases than he would be unfair to the defense if he himself had been the innocent victim of domestic abuse. By the majority's logic, disqualification would be imputed to any judge on any subject matter comprising part of his life's experience. But it is by these experiences that we learn and grow, as, I am sure, has Judge Turco.
Even accepting the logic of the majority's inference, in logical consequence we are robbed of the fundamental assumption upon which our judicial system is baseda judge will apply the law notwithstanding his possible personal preferences to the contrary. I note the complete absence in this record that Judge Turco has ever failed to faithfully discharge his duty to protect the legal rights of those who appeared before him in any matter involving a domestic dispute.
It is readily apparent from the facts of this case, no matter how one construes them, that both the Commission on Judicial Conduct and the majority of this court are in reality disciplining Judge Turco not because he caused physical harm to another human being in the way alleged but because of a subjective predisposition on the part of the judging authority to make a public statement about a social ill. Although the sentiment may very well be laudatory, the purpose of the Code of Judicial Conduct is to protect the integrity of the judicial system to fulfill its mission to protect the rights of those who might come before it, not to ensure conformity in thought or deed by its members in nonjudicial matters, nor make examples for public reference. We simply cannot equate, without more, a tortious personal act with lack of judicial impartiality.
Moreover, I find persuasive the views of the Pennsylvania Supreme Court that "[c]onduct of a judge or any public official which may be offensive to the personal sensitivities of a segment of the society is properly judged in the privacy of the ballot box." In re Dalessandro, 483 Pa. 431, 397 A.2d 743, 757 (1979). The proceeding which occasioned this advice involved a slapping incident between a judge and a woman with whom he shared an intimate relationshipsomething similar, if not more aggravated than we have here. In that case the court dismissed the proceeding, holding a professional misconduct proceeding "is not the proper forum for tort claims against judges, whether such claims are between husbands and wives, friends, or ... [those] who were involved in an intimate relationship." Id. at 758. I disagree with the majority's claim that this is not still an accurate statement of the law in Pennsylvania[4]; however, even if it were not, *752 I would adopt it as an expression of what the law ought to be here as it is consistent with the text and purpose of our Code of Judicial Conduct.
Although I cannot conclude as a matter of fact the Commissions has proved by clear, cogent, and convincing evidence Judge Turco intentionally harmed his wife, equally I cannot conclude the incident in question is so reasonably and substantially related to Canon 2(A)'s "public confidence in the integrity and impartiality of the judiciary" so as to allow for discipline. Therefore I would dismiss this proceeding against Judge Turco.
NOTES
[1] The dissent quotes extensively from the affidavits of the four Turco children. The affidavits cast considerable doubt on Mrs. Turco's veracity, and contain averments to the effect Mrs. Turco was trying to ruin Judge Turco. Thus, the affidavits are out of court statements tending to prove the truth of the matter asserted, i.e., that Mrs. Turco was untruthful when she said Judge Turco shoved her to the ground.

Judge Turco obtained these affidavits one to two months after the hearing, then sought and A. Yeah. obtained our permission to supplement them to the record. He offered no explanation why he did not call the Turco children to testify at the hearing. At least two of the children were actually present during the hearing. Aff. of Theresa Turco at 2. At the hearing, of course, they would have been subject to cross examination. Thus, although we have admitted the affidavits into the record, they are deserving of little weight, especially as compared to the two witnesses who largely corroborated Mrs. Turco's account of the incident and whom Judge Turco cross examined extensively at the hearing before the Commission.
[2] Art. IV, § 9 provides:

Any judge of any court of record, the attorney general, or any prosecuting attorney may be removed from office by joint resolution of the legislature, in which three-fourths of the members elected to each house shall concur, for incompetency, corruption, malfeasance, or delinquency in office, or other sufficient cause stated in such resolution. But no removal shall be made unless the officer complained of shall have been served with a copy of the charges against him as the ground of removal, and shall have an opportunity of being heard in his defense. Such resolution shall be entered at length on the journal of both houses and on the question of removal the ayes and nays shall also be entered on the journal.
[3] Art. V, § 2 provides:

The governor and other state and judicial officers, except judges and justices of courts not of record, shall be liable to impeachment for high crimes or misdemeanors, or malfeasance in office, but judgment in such cases shall extend only to removal from office and disqualification to hold any office of honor, trust or profit, in the state. The party, whether convicted or acquitted, shall, nevertheless, be liable to prosecution, trial, judgment and punishment according to law.
The House of Representatives has the sole power of impeachment, should a majority so agree. Trial occurs in the Senate, with two-thirds vote required for conviction. Wash Const, art. V, § 1. Our opinion in Deming is incorrect in asserting, "For almost the first hundred years of statehood the discipline and removal of judges lay with the judiciary itself and with the electorate." Deming, 108 Wash.2d at 89, 736 P.2d 639.
[4] The legislative history of Amendment 85 contains a memorandum dated April 13, 1989, from a staff member of the Senate Law and Justice Committee to the chair of the committee, Senator Pullen. It reads, in pertinent part:

As a general rule, de novo review allows the court to make its own independent judgment based on the record it has before it. De novo review does not mean that there is a new hearing. However, a court exercising de novo review is required to review the entire record of the earlier proceeding. The court may substitute its judgment for that of the Commission on both findings of fact and conclusions of law. De novo review does not permit going beyond the earlier record of proceedings and, as mentioned above, there is no new hearing. Presumably, under de novo review the case could be remanded for a new hearing by the Commission.
Under normal administrative procedure a reviewing court will defer to an agency on a "clearly erroneous" or "arbitrary and capricious" standard when there are only questions of fact in dispute. If no questions of fact are in dispute and the court is solely reviewing questions of law, the court may exercise total review and substitute its judgment for that of the agency.
(Emphasis added.) See also the official comment to DRJ 7:
The generally accepted standard of review for Supreme Court proceedings in the area of judicial misconduct or disability is an "independent evaluation of the evidence." Hence, the Supreme Court functions with a broader standard of review than is usual for an appellate court reviewing a trial court decision.
The dissent's assertion the standard of review we follow in judicial discipline cases is different from the standard of review in attorney discipline cases is correct. The Constitution mandates a de novo review for decisions of the Commission on Judicial Conduct, while RLD 6.7(b), governing attorney disciplinary matters, establishes "substantial evidence" as the standard of review for findings of fact, and "de novo" as the standard of review for conclusions of law and recommendations made by a hearing officer. Our decision in In re Disciplinary Proceeding Against Heard, 136 Wash.2d 405, 963 P.2d 818 (1998), therefore, neither "undercuts" our decision here, as the dissent contends at 746, nor supports it. Heard, an attorney discipline case, is simply inapposite.
[5] Article IV, § 31(6) states:

Within thirty days after the commission admonishes, reprimands, or censures a judge or justice, the judge or justice shall have a right of appeal de novo to the supreme court.
See also In re Disciplinary Proceeding Against Deming, 108 Wash.2d 82, 87, 736 P.2d 639, 744 P.2d 340 (1987) ("A de novo review from which we make our own determination of the law and of the facts is required."); In re Disciplinary Proceeding Against Buchanan, 100 Wash.2d 396, 400, 669 P.2d 1248 (1983).
[6] Judge Turco spends considerable time worrying about whether the Commission proved civil or criminal assault within the technical meaning of those terms. This is immaterial to the central question in this case: Did Judge Turco intentionally push or shove his wife?
[7] The Legislature has established a clear public policy with respect to the importance of societal sensitivity to domestic violence and its consequences:

The purpose of this chapter is to recognize the importance of domestic violence as a serious crime against society and to assure the victim of domestic violence the maximum protection from abuse which the law and those who enforce the law can provide. The legislature finds that the existing criminal statutes are adequate to provide protection for victims of domestic violence. However, previous societal attitudes have been reflected in policies and practices of law enforcement agencies and prosecutors which have resulted in differing treatment of crimes occurring between cohabitants and of the same crimes occurring between strangers. Only recently has public perception of the serious consequences of domestic violence to society and to the victims led to the recognition of the necessity for early intervention by law enforcement agencies. It is the intent of the legislature that the official response to cases of domestic violence shall stress the enforcement of the laws to protect the victim and shall communicate the attitude that violent behavior is not excused or tolerated. Furthermore, it is the intent of the legislature that criminal laws be enforced without regard to whether the persons involved are or were married, cohabiting, or involved in a relationship.
RCW 10.99.010.
[8] Judge Turco did not stand for re-election in 1998.
[1] At oral argument the attorney for the Commission went so far as to suggest a judge who gave a speech to a rotary club critical of the law on domestic violence is also worthy of discipline. But see Canon 4(A) of the Code of Judicial Conduct that "[Judges] may speak, write, lecture, teach, and participate in other activities concerning the law, the legal system, and the administration of justice."; and cf. E. Wayne Thode, Reporter's Notes to Code of Judicial Conduct 74 (ABA, 1973) (judge may "propose legal reform without compromising his capacity to decide impartially the very issue on which he has spoken or written.").
[2] As the majority notes, the Commission did not even file its charges until August 27, 1997an unexplained delay of nearly 20 months. Majority at 736.
[3] Rake-Marona did tell the investigating officer that he did not hear every word of the conversation between Judge Turco and Mrs. Turco.
[4] The Pennsylvania case which the majority reads as a repudiation of Dalessandro is not applicable, Majority at 738-739 (citing Matter of Cunningham, 517 Pa. 417, 538 A.2d 473 (1988)), as the cited case involved allegations of cash payments to judges made in the context of an FBI investigation of labor racketeering. Cunningham, 538 A.2d at 475. While it is true the Pennsylvania Supreme Court rejected the "implication" from Dalessandro that personal matters in a judge's life may never be subject to sanction, it also warns that "[t]he overly suspicious mind often assigns guilt where none exists." Id. at 480 n. 12. The holding in Cunningham leaves undisturbed Dalessandro's holding that tortious behavior is not a fit subject for judicial sanction. Id.