PER CURIAM.
We review the recommendation of the Judicial Qualifications Commission (JQC) that Judge Sheldon Schapiro be disci *171 plined. We have jurisdiction. See art. V, § 12, Fla. Const. In a stipulation with the JQC, Judge Schapiro admits engaging in inappropriate behavior in court that is unbecoming a member of the judiciary, brings the judiciary into disrepute, and impairs the citizens’ confidence both in the integrity of the judicial system and in Judge Schapiro as a judge.
The stipulation, which quotes the notice of formal charges directed to Judge Scha-piro, sets forth the facts as follows:
Charge No. 1 — In violation of Canon 1, Canon 2A, and Canon 3B(4), in approximately 1996, you chastised an attorney, Joseph Dawson, for allegedly speaking in your courtroom by stating, ‘Why do I always have to treat you like a school child?” or words to that effect. When Mr. Dawson responded that you routinely treat everyone in your courtroom like a school child, you ordered him out of the courtroom. Since that time, Mr. Dawson has routinely sought your recu-sal and you have granted those requests.
Charge No. 2 — In violation of Canon 1, Canon 2A, and Canon 3B(4), in May, 1998, you ordered Denise Neuner, an assistant state attorney, to appear before you and try a criminal case although Ms. Neuner had previously contacted your chambers to explain she had a severe medical condition and had been ordered by her physician to bed rest because of the possibility she might have pneumonia.
Charge No. 3 — In violation of Canon 1, Canon 2A, and Canon 3B(4), in approximately March or April 1998, you attempted to force Greg Rossman, an assistant state attorney, to try a case that was assigned to another assistant state attorney. When Mr. Rossman responded that the practice of the State Attorney’s Office was for each assistant to try only his or her own cases, you proceeded to scream at Mr. Rossman and tell him that the case in question was a “nothing case,” which he should be prepared to try with no advance preparation. You further admonished Mr. Rossman by making the following sarcastic remarks:
THE COURT: All right, you want to waste my time, there will come a time I warn you, when I’m going to be tied up in something and you will have a speedy pending and my time will not be available. You are squandering the Court’s time.
Charge No. 4 — -In violation of Canon 1, Canon 2A, and Canon 3B(4), you have routinely berated and unnecessarily embarrassed attorneys for allegedly talking in your courtroom when those attorneys were either not talking at all or speaking in appropriately low tones of voice concerning legitimate business of the court (e.g. state attorneys and defense counsel conferring with one another concerning plea negotiations), as evidenced by the following examples:
a. You chastised and unnecessarily raised your voice at Ginger Miranda, an assistant public defender, as she attempted to confer with her client who was a prisoner in custody. Specifically, you said to Ms. Miranda, “Psst. Hey you. I’m sick and tired of the noise you make in my courtroom” or words to that effect. When Ms. Miranda explained that she was trying to discuss a plea offer with her client, you continued to berate her. Ms. Miranda then apologized to which you sarcastically replied, “Oh yeah, you’re sorry,” or words to that effect.
b. In approximately September, 2000, as Deborah Carpenter, an assistant public defender, was waiting in open court for her case to be called, another public defender began speaking with her. You then said, “Ms. *172 Carpenter, if you say one more word, I’m going to have you removed from the courtroom” or words to that effect. When the other assistant public defender interceded and stated, “Judge, I’m sorry, it was me,” you ignored her statement and responded, “I don’t want to hear another word out of you Ms. Carpenter” or words to that effect.
c. On another occasion, you ordered Bradley Weissman, an assistant state attorney, to leave the courtroom because you believed he was talking, although Mr. Weissman was not talking.
d. In a similar episode, during the summer of 1999, you had previously ordered everyone in the courtroom to be quiet. Dennis Siegel, an assistant state attorney, was among the attorneys in the courtroom at the time. You then turned to Mr. Siegel and said, “Mr. Siegel, I told you to be quiet” or words to that effect. Mr. Siegel responded that he had not been talking. Despite his denial, you continued to insist that you saw Mr. Sie-gel talking.
Charge No. 5 — This charge is dismissed.
Charge No. 6 — -In violation of Canon 1, Canon 2A, and Canon 3B(4), several years ago, as a criminal defense attorney was making an argument in a sexual battery case, you cut him off and said, “Do you know what I think of your argument?” or words to that effect, at which time you pushed a button on a device that simulated the sound of a commode flushing.
Charge No. 7 — In violation of Canon 1, Canon 2A, and Canon 3B(4), in a case involving a defendant driving with a suspended driver’s license approximately four years ago, Louis Pironti, an assistant public defender at the time, advised you during a sidebar conference that he might need a continuance in order to secure an expert witness. The sidebar was held in a small room behind the bench commonly known as the woodshed among attorneys familiar with your courtroom (hereinafter “backroom”). Instead of simply denying the motion, you became agitated and responded by saying to Mr. Pironti, “You’re going to try this mother fu_ing case.” You then returned to the bench and threw the docket down on a desk.
Charge No. 8 — In violation of Canon 1, Canon 2A, Canon 3B(4), and Canon 3B(5), approximately 4J/z years ago, as Shari Tate, a female assistant state attorney, was arguing a motion to revoke bond, you summoned Ms. Tate to the backroom behind your bench and told her that she needed to emulate the style of male attorneys when addressing the court because male attorneys did not get as emotional about their cases as the female attorneys did. As a result of this experience, Ms. Tate advised you that she would never go to the backroom with you again without a court reporter being present.
Charge No. 9 — In violation of Canon 1, Canon 2A, and Canon 3B(4), in another incident involving Ms. Tate when she was eight months pregnant, she was hospitalized because of pregnancy complications on the third day of a trial over which you presided. As a result of her hospitalization, Ms. Tate requested a continuance of the trial. You denied the continuance and further advised Ms. Tate that she should get another prosecutor from her office to complete the trial. When Ms. Tate advised your chambers that “substituting” counsel was not feasible in that no other assistant state attorney was familiar enough *173 with the case to step in her place, you, or your chambers, advised Ms. Tate that if she were not in court the following morning, you would dismiss the case. As a result, Ms. Tate left the hospital against her doctor’s orders in order to complete the trial before you.
Charge No. 10 — In violation of Canon 1, Canon 2A, and Canon 3B(4), in 1999, you presided over a bond hearing where a motorcyclist had killed a child and left the scene. The child’s mother and neighbor came to the bond hearing, which was approximately two days after the incident and before the child was buried. After you made a preliminary determination that the defendant was entitled to bond, the assistant state attorney advised you that the mother of the victim was present and wanted to address the court. You responded by saying, “What do I need to hear from the mother of a [deceased] [n] kid for? All she will tell me is to keep the guy in custody and never let him out” or words to that effect. The victim’s mother heard your sarcastic remarks and was then afraid to address the court.
[n]l The original Notice of Formal Charges alleged that Judge Schapiro used the word “dead” instead of “deceased.” Judge Schapiro denies that he used the word “dead;” rather, he contends he used the word “deceased.” Regardless of the actual verbiage used, however, Judge Scha-piro admits that his statement was inappropriate under the circumstances.
Charge No. 11 — In violation of Canon 1, Canon 2A, and Canon 3B(4), you have fallen into a general pattern of rude and intemperate behavior by needlessly interjecting yourself into counsel’s examinations of witnesses; embarrassing and belittling counsel in court; and questioning the competence of counsel by making remarks such as, “What, are you stupid?”
Inquiry Concerning a Judge, No. 99-325, Sheldon Schapiro, Stipulation at 1-5 (Fla. Judicial Qualification Comm’n report filed Nov. 22, 2002).
Based on the violations agreed to in the stipulation, the JQC found the following regarding discipline:
[T]he interests of justice and public welfare will be adequately served by the following discipline, which it hereby recommends to this Court:
(1) Public Reprimand to be delivered personally to [Judge Schapiro] before the Supreme Court of Florida;
(2) [Judge Schapiro’s] participation in psychological/behavioral therapy with an emphasis on sensitivity training by a qualified health care professional until such professional has certified, in writing, that such treatment is no longer necessary; and
(3) Public apology to the citizens of Broward County in the form attached hereto as Exhibit A.
Inquiry Concerning a Judge, No. 99-325, Sheldon Schapiro, Findings and Recommendation of Discipline at 1-5 (Fla. Judicial Qualification Comm’n report filed Nov. 22, 2002). The JQC considered in mitigation “the fact that [Judge Schapiro] has expressed remorse for his conduct and voluntarily undergone psychological evaluation and treatment and commits to continue such treatment as an express condition of the Stipulation.” Id. at 1.
We agree with the JQC’s determination that Judge Sheldon Schapiro has violated the Code of Judicial Conduct. We conclude that Judge Schapiro has clearly undermined the public’s confidence in and respect for both the integrity of the judicial system and Judge Schapiro as a judge. *174 These violations are extreme in their seriousness, in their number, and in the length of time over which they occurred. To undermine public confidence and respect by such serious violations strikes at the very roots of an effective judiciary, for those who are served by the courts will not have confidence in and respect for the courts’ judgments if judges engage in this egregious conduct. Were it not for Judge Schapiro’s efforts to participate in behavioral therapy, this Court would have sanctioned Judge Schapiro in a substantially more severe manner. Judge Schapiro is expressly notified that if his efforts do not consistently continue as agreed to in the stipulation, this Court will severely sanction Judge Schapiro’s misconduct.
In view of the stipulation and the ongoing treatment program, we approve the recommendation of a public reprimand and a continual treatment program but also order Judge Schapiro to, within thirty days of the filing of this opinion, write and mail personal letters of apology to those individuals identified in the above-quoted portion of the stipulation. Judge Schapiro is directed to appear before this Court for the administration of a public reprimand on June 4, 2003, at 9 a.m. Judge Schapiro shall pay the costs of these proceedings. See In re Hapner, 737 So.2d 1075, 1077 (Fla.1999).
It is so ordered.
ANSTEAD, C.J., and WELLS, PARIENTE, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.