236 P.3d 873 (2010)
In the Matter of the DISCIPLINARY PROCEEDING AGAINST Judith R. EILER, Judge of the King County District Court.
No. 200,701-5.
Supreme Court of Washington, En Banc.
Argued January 14, 2010.
Decided August 5, 2010.
*874 J. Reiko Callner, WCJC, Olympia, WA, William Harrison Walsh, Corr Cronin, Seattle, WA, for Petitioner.
Anne Melani Bremner, Stafford Frey Cooper, Seattle, WA, for Respondent.
J.M. JOHNSON, J.
¶ 1 The Honorable Judith Raub Eiler has served as a King County District Court judge for nearly 20 years. Over the course *875 of the past seven or eight years, several pro se litigants and attorneys have filed complaints criticizing Judge Eiler's courtroom behavior and demeanor as rude, intimidating, condescending, or demeaning. After investigating the complaints, the Washington State Commission on Judicial Conduct (Commission) reprimanded Judge Eiler in February 2005 for improper judicial demeanor. Nevertheless, complaints about Judge Eiler's demeanor on the bench continued and the Commission sanctioned her again in April 2009 for violating Canons 1, 2(A), 3(A)(3), and 3(A)(4) of the Code of Judicial Conduct (CJC). This time, the Commission censured Judge Eiler and recommended that she be suspended without pay for 90 days. Judge Eiler contests the severity of the suspension recommendation.
¶ 2 We find that Judge Eiler's demeanor and behavior violates only Canon 3(A)(3) of the CJC. This misconduct, combined with Judge Eiler's previous failure to change similar behavior, warrants the sanction of suspension. We order that she be suspended without pay for a lesser, five-day period.

FACTS AND PROCEDURAL HISTORY
¶ 3 The voters of King County elected Judge Eiler to the bench of their district court in 1992. She has served there ever since, winning re-election many times while managing a caseload that primarily consists of small claims and traffic infraction matters in which most, if not all, litigants appear pro se. Judge Eiler has heard close to 100,000 such matters during her tenure on the bench.
¶ 4 The conduct at issue in the present disciplinary action was first documented over half a dozen years ago, although it did not give rise to a formal disciplinary proceeding until October 2004.[1] Dep. Upon Oral Examination of Judith Raub Eiler (July 12, 2008), Ex. 5 (In re Eiler, CJC No. 4148-F-116, at 1-2 (Feb. 4, 2005)). During that proceeding, investigative counsel for the Commission produced evidence of nine discrete instances of misconduct tending to demonstrate that Judge Eiler had engaged in "a pattern or practice of rude, impatient and undignified treatment of pro se litigants in the courtroom." Id. Specifically, in those nine cases Judge Eiler had repeatedly "interrupted litigants; addressed them in an angry, condescending or demeaning tone of voice; threatened to rule against litigants who interrupted or annoyed her; and otherwise failed to conduct herself in a judicious manner." Id. at 2.
¶ 5 The proceeding concluded in late January 2005 when Judge Eiler stipulated that the aforementioned behavior had indeed "violated Canons 1, 2(A), 3(A)(1), 3(A)(3), and 3(A)(4) of the [CJC]." Id. Judge Eiler expressly agreed that she had
undermined public confidence in, and respect for, both the integrity of the judicial system and herself as a judge[,] ... indicate[d] [that she] would act arbitrarily and base her decision[s] on factors other than the objective application of the evidence to the law[,] .. .abused her judicial power[,]... failed in her duty to be patient, dignified and courteous[,] ... prevented some litigants from fully presenting their case by interrupting them without justification[,] intimidated other litigants[,] and discouraged some [litigants] from presenting their testimony or their positions in court.
Id. at 3. Based on these stipulations, the Commission sanctioned Judge Eiler by issuing an order of reprimand in February 2005. Id. at 7. The reprimand required Judge Eiler to participate in ethics training, refrain from engaging in similar misconduct in the future, read and familiarize herself with the CJC, and participate in behavioral therapy. Id. at 5. Judge Eiler completed these requirements in early August 2006. Tr. of Proceedings (Nov. 19, 2008), Ex. 117 (In re Eiler, CJC No. 5198-F-136 (Aug. 4, 2006)).
¶ 6 However, Judge Eiler's behavior did not improve and investigative counsel for the Commission submitted a statement of allegations to Judge Eiler in February 2008, listing 10 new cases in which Judge Eiler allegedly demonstrated "a pattern or practice of rude, impatient, undignified, and intimidating treatment of pro se litigants, attorneys[,] and *876 court personnel." Id. Ex. 101, at 3. This treatment included conduct largely analogous to that for which Judge Eiler had previously been disciplined: "repeatedly interrupting litigants and/or their attorneys; addressing them in an angry, disdainful, condescending and/or demeaning manner; threatening in open court to fire court personnel if litigants spoke to them; and otherwise failing to conduct [herself] in a judicious manner." Id. Investigative counsel also alleged that Judge Eiler improperly dismissed a traffic infraction after the defendant in that case formally complained about Judge Eiler's demeanor. Id. at 3-4. Counsel contended that the defendant had not requested reconsideration of her case and that the abrupt dismissal suggested that Judge Eiler was motivated by self-interest or other improper purposes when she dismissed the infraction. Id.
¶ 7 Complaints about Judge Eiler continued after the issuance of the statement of allegations. As a result, the Commission amended its statement of allegations in April 2008 to incorporate five new instances of improper judicial behavior. Id. Ex. 102. A statement of charges summarizing all 15 documented cases of alleged misconductthe 5 new cases and the 10 original oneswas issued in June 2008. Id. Ex. 112.
¶ 8 The Commission conducted a fact-finding hearing with respect to these charges over four days in November 2008. It issued its decision nearly six months later in April 2009, finding by clear, cogent, and convincing evidence that Judge Eiler had violated Canons 1, 2(A), 3(A)(3), and 3(A)(4) of the CJC, but not Canon 2(B), a violation of which had also been alleged. In re Eiler, CJC No. 5198-F-136, at 9-10 (Commission Decision Apr. 10, 2009), hereinafter "Commission Decision." After weighing a series of nonexclusive factors suggested by its internal rules of procedure, the Commission imposed the sanction of censure. Commission Decision at 17. Despite the urging of disciplinary counsel that Judge Eiler be removed from the bench, the Commission recommended suspension for 90 days without pay. Id. Judge Eiler moved for reconsideration and, following the Commission's denial of that motion, filed notice of contest in this court in June 2009. Br. of Comm'n on Judicial Conduct at 3.

ISSUES
1. Did Judge Eiler violate Canons 1, 2(A), 2(B), 3(A)(3), and 3(A)(4) of the CJC as demonstrated by clear, cogent, and convincing evidence?
2. If so, what is the appropriate sanction admonishment, reprimand, censure, suspension, or removalfor a judge who repeatedly has violated these canons?

ANALYSIS
¶ 9 We review de novo the findings of fact and conclusions of law made by the Commission. In re Disciplinary Proceeding Against Deming, 108 Wash.2d 82, 87, 736 P.2d 639 (1987). That is, "`upon our own independent inquiry,'" we determine "`whether the evidence clearly and convincingly proves that [the] respondent acted in such a manner as to prejudice the administration of justice and bring the judicial office into disrepute.'" Id. at 88, 736 P.2d 639 (quoting In re Kneifl, 217 Neb. 472, 477, 351 N.W.2d 693 (1984)). Although we give considerable weight to the credibility determinations of the Commission and serious consideration to the Commission's recommended sanctions, the ultimate decisions of whether and how to discipline an errant judge falls to the Supreme Court. See In re Disciplinary Proceeding Against Anderson, 138 Wash.2d 830, 843, 981 P.2d 426 (1999) (citing In re Disciplinary Proceeding Against Ritchie, 123 Wash.2d 725, 870 P.2d 967 (1994); Deming, 108 Wash.2d at 88, 736 P.2d 639).

1. Violation of the Canons

¶ 10 Judge Eiler allegedly violated Canons 1, 2(A), 2(B), 3(A)(3), and 3(A)(4) of the CJC. Tr. of Proceedings (Nov. 19, 2008) Ex. 102. The pertinent language from each of these canons is as follows:
CANON 1
JUDGES SHALL UPHOLD THE INTEGRITY AND INDEPENDENCE OF THE JUDICIARY

*877 An independent and honorable judiciary is indispensible to justice in our society. Judges should participate in establishing, maintaining, and enforcing high standards of judicial conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved. The provisions of this Code are to be construed and applied to further that objective.
CANON 2
JUDGES SHOULD AVOID IMPROPRIETY AND THE APPEARANCE OF IMPROPRIETY IN ALL THEIR ACTIVITIES
(A) Judges should ... act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
(B) ... Judges should not lend the prestige of judicial office to advance the private interests of the judge or others; ....
CANON 3
JUDGES SHALL PERFORM THE DUTIES OF THEIR OFFICE IMPARTIALLY AND DILIGENTLY
. . . .
(A) Adjudicative Responsibilities.
. . . .
(3) Judges should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom judges deal in their official capacity,....
(4) Judges should accord to every person who is legally interested in the proceeding, or that person's lawyer, full right to be heard according to law,....
Washington Code of Judicial Conduct.
¶ 11 We enforce these standards, which some commentary suggests are meant to hold judges to the highest possible ethical and professional standards,[2] by means of a bifurcated disciplinary procedure set forth in the Washington Constitution. See WASH. CONST. art. IV, § 31. The first half of this procedure takes place before the Commission, which investigates judicial conduct complaints. Id. § 31(2)-(3). If the Commission dismisses the case or admonishes, reprimands, or censures the judge, the process is complete. Id. § 31(4). The Commission may also, however, censure the judge and recommend to the Supreme Court his or her suspension, removal, or early retirement, depending on the severity of the transgression and the age of the wayward judge. Id. If the Commission makes one of these recommendations, the case transfers to the Supreme Court, which independently reviews the Commission's findings. Id. § 31(5); Anderson, 138 Wash.2d at 843, 981 P.2d 426; supra pp. 876-77 (standard of review is de novo). Here, the Commission having recommended to us the suspension of Judge Eiler, we independently review whether she violated the relevant canons and, if so, whether the proposed sanction is appropriate.
¶ 12 In doing so, it may be helpful to consider examples of the type of language that gave rise to this latest disciplinary proceeding. In one case, a defendant had been cited for driving 15 miles per hour over the speed limit without a seatbelt. Tr. of Proceedings (Nov. 19, 2008) Ex. 103 (Tr. of IO5569754).[3] The following exchange took place:
D: I was going with traffic.
J: That's a bad idea.... [E]verybody's doing it doesn't cut it. Duh.
. . . .
D: And I had out of state plates.
J: That wouldn't matter in Washington.
D: Oh.

*878 J: We don't troll for stupid people out of state who speed over the speed limit that they think it is.
Id. at 1-2. Judge Eiler questioned the intelligence of a defendant the very next day:
J: So do you have a better reason for me to reduce the amount of this infraction, other than telling me that you were an idiot and driving with the cars around you[?]
D: No, I would never say that I was an idiot....
Id. Ex. 103 (Tr. of IO5405813), at 1-2. She lectured another litigant a few minutes later for driving without proof of insurance, adopting a condescending tone of voice to explain the following:
J: The wise person takes that little bitty [insurance] card ... [a]nd you cut it out.
D: Okay.
J: It's the same size as your driver's license, you slide it behind it then you don't have to come here.
Id. Ex. 103 (Tr. of IO5282732), at 2. Judge Eiler again scolded a defendant in an unnecessarily patronizing tone the following month, this time for speeding:
You know, that's, that's the problem with mature people, they think, I see my exit so I have to get ahead, imagine that, ahead of those other trucks, then what did you probably do, you probably put on your brake to slow down to get off at the off-ramp making all those people behind you think that you were an idiot.
Id. Ex. 103 (Tr. of IO5669069). A few minutes later, Judge Eiler used the word "idiot" again to warn another litigant: "If you drive like an idiot [']cause you're late for work, you're gonna have to pay for it." Id. Ex. 103 (Tr. of IO5608421), at 1. She added, "You can see your picture on the headlines of the Seattle Times, stupid young man who shouldn't be driving." Id. at 2. All of these defendants appeared pro se and behaved respectfully toward Judge Eiler. See id. Ex. 103.
¶ 13 Aside from deriding the intelligence of these pro se litigants who appeared before her, Judge Eiler also interrupted them on occasion in a rude, impatient, and undignified manner. In one representative case, a teenager cited for speeding had missed his scheduled court appearancethe boy's father, at whose house the boy received his mail, was on vacation when the notice arrived and through the hearing date. When the father returned home and found the notice, he called the court and asked for a hearing in person rather than a mitigation by mail. After speaking with the court clerk, the father erroneously believed that he and his son had received permission to appear in person. Both father and son attempted to explain the miscommunication to Judge Eiler but were brusquely interrupted.[4]
J: Ah, you sent yours in by mail.
S: No, he, uhm [sic], if I might speak.
J: Nope, you may not speak.
S: Okay.
J: ... Did you send in your mitigation by mail?
D: Yeah, and then I requested ...
S: No, no, no we didn't send it in.
J: Father.
S: Yes.
J: He's not a puppet, you don't get to make his mouth move. I'm asking him the question.
D: We requested that ...
J: [interrupting] [Y]ou didn't go to one of your appearances.... You sent us a letter saying please let me come back in and explain. The court ... said yes you may explain, but you have to do it by mail. You didn't do that, right?
D: I believe we called in and requested to have a court day in person and they
. . .
J: [interrupting] The court ordered you to do it by mail. It's not an option.... Don't expect a big favor by the court when you're not paying attention to what you're supposed to do.
*879 Id. Ex. 103 (Tr. IT0033132), at 1-2; Exs. 104, 105H. Besides verbally interrupting litigants in her courtroom, Judge Eiler occasionally whistled at them and pounded on her desk to get their attention or interrupted their testimony with questioning. Id. Ex. 105.
¶ 14 Although each of these examples of Judge Eiler's conduct in the courtroom may appear fairly inoffensive alone, when considered cumulatively, the sum of the evidence points to another conclusion. One or two rude, impatient, or even slightly condescending comments might be understandableafter all, no jurist is perfect. But more than a dozen such instances is not understandable; rather, it evidences an unacceptable pattern of misbehavior. Judge Eiler's conduct and demeanor lacked the patience, dignity, and courtesy expected of members of the judiciary and at times denied parties their right to be heard. The evidence clearly establishes that she has violated Canon 3(A)(3) of the CJC.
¶ 15 The testimony of others who complained of their treatment in court by Judge Eiler supports this finding. Several litigantsand even some attorneysreported being "embarrassed" by Judge Eiler's "degrading" treatment, and feeling "mocked," "attacked," and "uncomfortable" in her courtroom. Cited at Br. of the Comm'n on Judicial Conduct at 6-7. One litigant testified that Judge Eiler "chose to interrupt me and insult my education and insinuate that I didn't know how to read instead of listening to me." Id. at 7.
¶ 16 Given the voluminous testimony at trial documenting Judge Eiler's rude, discourteous, undignified, and demeaning treatment of the attorneys and pro se litigants who appeared before her, we find that clear, cogent, and convincing evidence demonstrates that Judge Eiler violated Canon 3(A)(3). Accordingly, we affirm the finding of the Commission to that effect.[5]
¶ 17 We also affirm the Commission's finding that Judge Eiler did not violate Canon 2(B) as alleged. The complainant involved in the alleged violation, Elizabeth Alexandra, reported that the judge "unnessisarily [sic] belittle[d], humiliate[d] and insult[ed] me ... to the point of breaking down in tears. She insulted my inteligence [sic] and bullied me.... Furthermore, she frequently interupted [sic] answers with insults...." Tr. of Proceedings (Nov. 18, 2008) Ex. 106. Judge Eiler responded to the complaint six days later by writing a letter of apology to Alexandra and revising her finding in the case so as to dismiss Alexandra's speeding citation. See id. Ex. 107. She stated that Alexandra's letter "made me seriously review my handling of my traffic court matters" and that without it "I might not have changed." Id.
¶ 18 A violation of Canon 2(B) was charged by disciplinary counsel with respect to the Alexandra case. Although it may be that Judge Eiler would not have reviewed Alexandra's case or reversed her ruling but for Alexandra's submission of a formal complaint about her demeanor, it is not clear that Judge Eiler changed the disposition of that case in order to advance her own "private interest," CJC Canon 2(B)that is, in order to avoid disciplinary proceedings. Rather, Judge Eiler testified at the fact-finding hearing that she was motivated by a desire to correct what in retrospect she perceived to be her mishandling of the case. Tr. of Proceedings (Nov. 20, 2008) at 533, 548-49 (Judge Eiler considered Alexandra's letter to be an "inartful" motion for reconsideration). Id. at 548. Although some evidence exists that other considerations motivated Judge Eiler, it is far from clear, cogent, and convincing. *880 We therefore affirm the finding of the Commission that no violation of Canon 2(B) occurred.
¶ 19 We disagree with the Commission, however, regarding Judge Eiler's alleged violations of Canons 1, 2(A), and 3(A)(4). Judge Eiler's rude, discourteous, and impatient behavior was certainly unprofessional, but it did not go so far as to undermine the integrity and independence of the judiciary, demonstrate disrespect for the law or evidence any failure by Judge Eiler to obey it or deny any person legally interested in a proceeding his or her full right to be heard according to law.
¶ 20 Judge Eiler did not cut deals with litigants behind closed doors, accept bribes, or otherwise demonstrate that her decisions were governed by anything other than the law and the facts of the cases. Her misconduct also did not undercut public perceptions of judicial integrity or impartiality. She showed no favoritism, prejudice, partiality, or bias in her courtroomshe was impolite and impatient on occasion, but not to any particular class or group of litigants. Although she frequently interrupted litigants rudely and condescendingly, she did so to protect the record and maintain order in her courtroom and never denied litigants the opportunity to present their cases. Evidencing this is the fact that she closed most of her hearings by asking whether the litigants had anything else to say. We therefore find that Judge Eiler's demeanor and behavior on the bench did not violate Canons 1, 2(A), and 3(A)(4), and we reverse the Commission's findings to the contrary.

2. Appropriate Sanction

¶ 21 Having independently confirmed that Judge Eiler violated Canon 3(A)(3) of the CJC, but not Canons 1, 2(A), 2(B), or 3(A)(4), we must now determine the proper sanction to impose. In doing so, like the Commission, we consider the following factors: (A) whether the misconduct is an isolated instance or evidence of a pattern of misconduct; (B) the nature, extent, and frequency of occurrence of the acts of misconduct; (C) whether the misconduct occurred in or out of the courtroom; (D) whether the misconduct occurred in the judge's official capacity, or in the judge's private life; (E) whether the judge flagrantly and intentionally violated the oath of office; (F) the nature and extent to which the acts of misconduct have been injurious to other persons; (G) the extent to which the judge exploited the judge's official capacity to satisfy personal desires; and (H) the effect the misconduct has upon the integrity of and respect for the judiciary. Code of Judicial Conduct Rules of Procedure (CJCRP) 6(c)(1); see also Deming, 108 Wash.2d at 119-20, 736 P.2d 639. Other considerations include the service and demeanor of the judge, namely, (A) whether the judge has acknowledged or recognized that the acts occurred, (B) whether the judge has evidenced an effort to change or modify the conduct, (C) the judge's length of service in a judicial capacity, (D) whether there has been prior disciplinary action concerning the judge, and (D) whether the judge cooperated with the commission investigation and proceeding. CJCRP 6(c)(2); see also Deming, 108 Wash.2d at 119-20, 736 P.2d 639.
¶ 22 Many of these factors weigh against Judge Eiler, indicating that a more severe sanction than usual might be appropriate. First, Judge Eiler's misconduct is not isolated, but rather is evidence of a pattern of impatient, undignified, rude, demeaning, and discourteous behavior in the courtroom. CJCRP 6(c)(1)(A).[6] The acts of misconduct at issue were frequent and serious. CJCRP 6(c)(1)(B). They occurred in the courtroom and in Judge Eiler's official capacity. CJCRP 6(c)(1)(C)-(D). They were injurious to the attorneys and pro se litigants who appeared before Judge Eiler. CJCRP 6(c)(1)(F); see supra pp. 877-78; Tr. of Proceedings (Nov. 18, 2008) at 72, 115; Tr. of Proceedings (Nov. 19, 2008) at 256, 323, 338-39, 345, 371, 425.
¶ 23 Judge Eiler has not acknowledged that her conduct and demeanor violated the canons. CJCRP 6(c)(2)(A). In fact, she defends her misconduct as a byproduct of her *881 personality, Br. of Judith R. Eiler at 2, and believes that it is an important aspect of her judging style. Tr. of Proceedings (Nov. 21, 2008) at 971-75. If it is a violation of the canons at all, Judge Eiler believes it is "de minim[i]s." Id. at 1021. She did not improve her conduct, despite agreeing to do so as part of her previous disciplinary sanction for similar transgressions. CJCRP 6(c)(2)(B); Commission Decision at 15-16. Furthermore, Judge Eiler's long years on the bench aggravate, rather than mitigate, her misconductshe should know better. CJCRP 6(c)(2)(C). Her prior disciplinary action for similar conduct also weighs in favor of a rigorous sanction. CJCRP 6(c)(2)(D); Commission Decision at 15-16.
¶ 24 Other factors suggest that a more lenient sanction is warranted. Judge Eiler did not, for example, flagrantly or intentionally violate her oath of office.[7] CJCRP 6(c)(1)(E). Nor did she exploit her official capacity to satisfy personal desiresaside perhaps from her desire to too-rigidly control proceedings in her courtroom, like a "vice principal," CJCRP 6(c)(1)(G); Tr. of Proceedings (Nov. 21, 2008) at 971-72or undermine the integrity of the judiciary. CJCRP 6(c)(1)(H). Judge Eiler's cooperation with the disciplinary investigation and proceedings also somewhat lessens the need for a severe sanction, CJCRP 6(c)(2)(E), as does the fact that the proven incidents of misconduct represent an extremely small fraction of her case loadwell under one percentover the relevant period. See Br. of Judith R. Eiler at 6. Nevertheless, these mitigating factors are dwarfed by the number and seriousness of the aggravating factors discussed above. Full consideration of the Deming case thus indicates that a harsher sanction is called for here.
¶ 25 Our precedents and cases from other jurisdictions suggest that removal, the sanction sought by counsel for the Commission, is unduly harsh for these facts. Most cases that have resulted in removal involved misconduct much more egregious than Judge Eiler's,[8] and very few judges have been removed for demeanor-based misconduct alone. See, e.g., In re Walsh, 356 S.C. 97, 587 S.E.2d 356 (2003) (judge removed for repeatedly yelling at litigants, making demeaning comments, failing to dismiss a juror with small children, and subjecting litigants to unwarranted pretrial and jury trial procedures). The same comparison holds, albeit to a lesser degree, with respect to cases from other jurisdictions in which lengthy terms of suspension[9] have been ordered.[10]
*882 ¶ 26 Most cases involving conduct similar to that of Judge Eiler's have resulted in the issuance of a reprimand[11] or censure.[12] However, since a reprimand has proved ineffective at changing Judge Eiler's conduct and demeanor in the past, and since Judge Eiler has defended her conduct as a matter of judicial philosophy, the more serious sanction of suspension is warranted here. The need for a harsher sanction is further evidenced by Judge Eiler's statements that she does not believe the canons are binding on her behavior in the courtroom and that she stipulated otherwise solely to resolve her prior disciplinary investigation. Tr. of Proceedings (Nov. 19, 2008) at 489-97. This testimony reveals, at best, a reluctance to modify her behavior in the future; at worst, it may signal that she does not feel the need to do so at all.
¶ 27 In light of these concerns, a more severe sanction than customarily has been issued in response to demeanor-based complaints is required if we are to effectuate the desired change in Judge Eiler's behavior.[13] It is clear that a second reprimand or censure without any suspension at all would be too lenient. We therefore affirm the Commission's censure of Judge Eiler but, considering the comparative mildness of the sanctions that have been issued in the past for similar instances of misconduct and the fact that we find Judge Eiler to have violated only one of the relevant canons, we reject its recommendation and suspend her without pay for five days only.

CONCLUSION
¶ 28 Judge Eiler necessarily endeavors to achieve judicial efficiency and punitive effectiveness in her courtroom. These are desirable goals for a judge and are especially necessary in a court with a voluminous case loadbordering on 100,000 cases over 18 yearslargely comprised of pro se litigants and offenders who lack experience in our court system. However, we require our judiciary to be efficient and effective without being rude, discourteous, or demeaning. The CJC demands consistently dignified conduct. Judge Eiler has failed to satisfy the standard with respect to Canon 3(A)(3). Her failure to *883 improve her deportment after one prior admonishment merits a more severe penalty than is typical. As a result, we find that a five-day suspensiona more serious punishment than a second reprimand or censureis the appropriate sanction for Judge Eiler.
WE CONCUR: CHARLES W. JOHNSON, and TOM CHAMBERS, Justices, and CHRISTINE QUINN-BRINTNALL, Justice Pro Tem.
SANDERS, J. (concurring).
¶ 29 Four justices endorse suspending the Honorable Judith Raub Eiler without pay for five days. Four justices find suspension without pay for 90 days appropriate. Both choices leave much to be desired, but I believe suspension for five days without pay presents the lesser of two evils we could loose upon Judge Eiler. I endorse such a result only to avert the dissent's undeservedly harsh sanction. Accordingly I agree with the lead opinion in result only, and I write separately to explain why I believe reprimand presents the appropriate sanction.

ANALYSIS
¶ 30 I agree with the lead opinion that Judge Eiler did not violate Canons 1, 2(A), 2(B), or 3(A)(4) of the Code of Judicial Conduct (CJC). See lead opinion at 880. I also agree Judge Eiler violated Canon 3(A)(3), which was proved by clear, cogent, and convincing evidence. Id. at 879. However, I believe the lead opinion's unpaid five-day suspension is disproportionate with past sanctions doled out for similar conduct. I would hold Judge Eiler should suffer the sanction of reprimand for violating Canon 3(A)(3).
We review Commission on Judicial Conduct (Commission) recommendations de novo. In re Disciplinary Proceeding Against Anderson, 138 Wash.2d 830, 843, 981 P.2d 426 (1999). "De novo review of judicial disciplinary proceedings requires an independent evaluation of the record as the court is not bound by the Commission's findings or conclusions." Id. (citing In re Disciplinary Proceeding Against Turco, 137 Wash.2d 227, 246, 970 P.2d 731 (1999)). We independently determine if the judge violated the CJC and, if so, impose the proper sanction. Id.
The lead opinion imposes a sanction of suspension without pay for five days. Lead opinion at 875, 882-83. While this represents an improvement over the Commission's sanction of suspension for 90 days without pay, it still departs from sanctions imposed in analogous cases. While the lead opinion notes aggravating and mitigating factors, it pins its departure primarily on Judge Eiler's disciplinary history: A reprimand in 2005 for similar conduct. "[S]ince a reprimand has proved ineffective at changing Judge Eiler's conduct and demeanor in the past, and since Judge Eiler has defended her conduct as a matter of judicial philosophy, the more serious sanction of suspension is warranted here." Id. at 882.
¶ 31 Prior disciplinary action is merely 1 of 14 nonexclusive factors we analyze to determine the proper sanction. See Code of Judicial Conduct Rules of Procedure (CJCRP) rule 6(c)(2)(D);[1]see also In re Disciplinary *884 Proceeding Against Deming, 108 Wash.2d 82, 119-20, 736 P.2d 639, 744 P.2d 340 (1987). The lead opinion's overreliance on this factor exaggerates its import.
¶ 32 Judge Eiler's past disciplinary record indicates that in January 2005 she stipulated that she had violated CJC Canons 1, 2(A), 3(A)(1), 3(A)(3), and 3(A)(4). The sanction in that separate proceeding, which involved violations of five canons, was reprimand. In contrast, here Judge Eiler violated only one canon: 3(A)(3). It does not make sense to impose a significantly harsher sanction for a significantly lesser violation. We should impose a sanction that is appropriate for the conduct. Deming, 108 Wash.2d at 117-20, 736 P.2d 639, 744 P.2d 340.
¶ 33 Case law supports reprimand. As the lead opinion thoroughly explains, cases involving similar conduct have generally resulted in reprimand. Lead opinion at 882 n. 11 ("See, e.g., In re Schapiro, 845 So.2d 170 (Fla.2003) (judge reprimanded for belittling, embarrassing, and yelling at attorneys, including calling them `stupid'); Ex parte Haymans, 767 So.2d 1173 (Fla.2000) (judge reprimanded for ongoing pattern of rudeness); In re Wood, 720 So.2d 506 (Fla.1998) (judge reprimanded for rude behavior after prior admonishment); In re Inquiry Concerning a Judge re Wright, 694 So.2d 734 (Fla.1997) (judge reprimanded for two occasions of rude and inappropriate conduct, including telling a party to `keep your mouth shut')"); see also Miss. Comm'n on Judicial Performance v. Sutton, 985 So.2d 322 (Miss.2008) (reprimand for verbally abusing litigant and for ex parte contact); In re Horan, 85 N.J. 535, 428 A.2d 911 (1981) (per curiam) (reprimand for conducting trial in impatient, undignified, and discourteous manner, and for insulting remarks toward litigant).
¶ 34 The lead opinion recognizes that "even some cases in which reprimands have been issued involve somewhat more serious misconduct than that at issue here." Lead opinion at 881-82 n. 10 (emphasis added); see In re Judicial Disciplinary Proceedings Against Michelson, 225 Wis.2d 221, 224, 591 N.W.2d 843 (1999) (reprimand for angrily telling litigant, "`I suppose it was too much to ask that your daughter keep her pants on and not behave like a slut'"); In re Complaint Against Lindner, 271 Neb. 323, 326, 710 N.W.2d 866 (2006) (reprimand appropriate sanction for harsh, angry, and racially derogatory reference to litigant who required an interpreter).
¶ 35 An unpaid five-day suspension is too harsh a sanction. Dodds v. Comm'n on Judicial Performance, 12 Cal.4th 163, 906 P.2d 1260, 48 Cal.Rptr.2d 106 (1995) (censure too harsh a sanction for rudeness, hostile interruptions, yelling, biased jokes, and interfering with an investigation). While Judge Eiler sometimes acted discourteously, even rudely, her conduct did not rise to that of other judges whose behavior warranted suspension. If reprimand is the appropriate sanction for egregious conduct such as racial slurs (Lindner, 271 Neb. 323, 326, 710 N.W.2d 866 (2006) and personal attacks of a sexual nature (Michelson, 225 Wis.2d 221, 591 N.W.2d 843), Judge Eilerwho refrained from that degree of ignobilityshould not suffer suspension. While the CJCRP factors largely militate against Judge Eiler, the lead opinion's punishment goes too far.
¶36 If I were not compelled today to concur with the lead opinion in result only, I would impose the sanction of reprimand for Judge Eiler's violation of Canon 3(A)(3).
ALEXANDER, J. (dissenting).
¶ 37 I disagree with the lead opinion's conclusion that King County District Court Judge Judith Eiler did not violate Canons 1, 2(A), and 3(A)(4) of the Code of Judicial Conduct. In my view, the lead opinion describes conduct by Judge Eiler that clearly demonstrated her failure to observe high standards of judicial conduct that preserve the integrity of the judiciary (Canon 1). This conduct also served to undermine the public's confidence in the integrity and impartiality of the judiciary (Canon 2(A)), and it impaired *885 the right of "legally interested" persons to be heard (Canon 3(A)(4)). Indeed, the lead opinion's statement that Judge Eiler's "impatient, undignified, rude, demeaning, and discourteous behavior in the courtroom" was "frequent and serious" and was "injurious to the pro se litigants and attorneys who appeared before [her]" belies any conclusion that the aforementioned canons were not violated. Lead opinion at 880.
¶ 38 Our state's courts of limited jurisdiction are often referred to as the "people's courts." They occupy that status because each day large numbers of litigants, witnesses, and spectators file into their courtrooms. While it is certainly understandable that the judges who preside over these courts may often feel stressed as they confront crowded court dockets and preside at the many hearings and trials where the parties before them are not represented by counsel, that does not excuse conduct by a judge of the sort described in the lead opinion. Statements by a judge implying that a litigant is an "idiot" or "stupid" and the rendering of other derisive comments about persons who are before the judge is not conduct that engenders respect for the judiciary or provides confidence in the impartiality of the justice system. By the same token, Judge Eiler's act of whistling and pounding on the bench in the manner disclosed by the electronic record is unacceptable judicial conduct.
¶ 39 Finally, I must say that I strongly disagree with the lead opinion's conclusion that we should merely censure Judge Eiler rather than accept the recommendation of the Judicial Conduct Commission that she be suspended without pay for 90 days. I reach my decision, in part, because I believe that Judge Eiler violated Canons 1, 2(A), and 3(A)(4) in addition to the canon that the lead opinion holds she has violated. My principal reason, though, for favoring the recommended suspension is that this is not the first time Judge Eiler's conduct has drawn the attention of the Judicial Conduct Commission. As the lead opinion notes, in 2005 Judge Eiler stipulated that she had violated the same canon that the Commission on Judicial Conduct found that she violated here. Although the lead opinion has not upheld the commission's determination that Judge Eiler violated Canons 1, (2)(A), and 3(A)(4), it does conclude that she has violated Canon 3(A)(3) for the second time. This repetitive misconduct calls for a penalty more severe than a reprimand, the penalty meted out in 2005. The lead opinion concedes that point, indicating that Judge Eiler's long years on the bench and her repetitive misconduct calls for "a more serious punishment" than that which was imposed for her earlier misconduct. Lead opinion at 883. It, nevertheless, goes on to impose a sanction that is only slightly more severe than the 2005 sanctiona censure accompanied by a five-day suspension. In my judgment, Judge Eiler's failure to improve her judicial behavior merits a sanction that is considerably more severe than the sanction imposed on the prior occasion.
¶ 40 For the reasons stated above, I would have us suspend Judge Eiler without pay for a 90-day period, a sanction that, in a real sense, is harsher than that imposed in 2005. Because the lead opinion reaches a different conclusion, I dissent.
WE CONCUR: BARBARA A. MADSEN, Chief Justice, MARY E. FAIRHURST and DEBRA L. STEPHENS, Justices.
NOTES
[1] Judge Eiler did, however, take a month-long leave of absence from the bench in January 2004 at the request of her presiding judges, who had received several complaints about her demeanor. In re Eiler, CJC No. 5198-F-136, at 2 (Commission Decision April 10, 2009).
[2] "Because of the pivotal role judges play in preserving the rule of law, judges must be ethical, and their actions must foster respect for their decisions as well as for the judiciary as a whole. Given that they hold positions of considerable authority and are entrusted with a great deal of power and discretion, judges are expected to conduct themselves according to high standards of professional conduct. Indeed, it is often said that judges are subject to the highest standards of professional behavior." James J. Alfini et al., Judicial Conduct and Ethics § 1.02, at 1-4 (4th ed.2007).
[3] The defendant is designated "D" and Judge Eiler is designated "J" in this transcript and in all subsequent transcripts unless otherwise indicated.
[4] This transcript varies slightly in that it includes the defendant's father, who is designated "S." The defendant and Judge Eiler retain their earlier designations.
[5] Judge Eiler contends that her speech and conduct in the courtroom is protected by the First Amendment. Br. of Judith R. Eiler at 29-31. However, judges do not have a right to use rude, demeaning, and condescending speech toward litigants. Cf. In re Disciplinary Proceeding Against Sanders, 135 Wash.2d 175, 188, 955 P.2d 369 (1998) ("Courts have frequently recognized the First Amendment rights possessed by a candidate for political office.... We see no reason why the sample principles should not apply to speech by a sitting judge, albeit with somewhat less force." (emphasis added)). Such limitations are certainly narrowly tailored to achieve the compelling interest of preserving respect for, and the integrity of, the judicial system. Id. at 189-90, 955 P.2d 369.
[6] Clerks in her court testified that Judge Eiler behaved as described herein "[p]retty much all the time" or at least "50 percent of the time." Tr. of Proceedings (Nov. 18, 2008) at 161, 186.
[7] See RCW 3.34.080.
[8] See, e.g., In re Disciplinary Proceeding Against Anderson, 138 Wash.2d 830, 981 P.2d 426 (1999) (judge removed for participating in sale of business belonging to deceased client after appointment to bench, deliberately failing to report payments for the sale, and continuing to serve as president of three corporations); In re Barr, 13 S.W.3d 525 (Tex.Rev.Trib.1998) (judge removed for making offensive and sexually harassing remarks to other justice system personnel); Miss. Comm'n on Judicial Performance v. Spencer, 725 So.2d 171 (Miss.1998) (judge removed for cursing and humiliating litigants, sexually harassing court employees, and engaging in ex parte communications); Matter of Inquiry Concerning a Judge No. 1496, 261 Ga. 537, 407 S.E.2d 743 (Ga.1991) (judge who had been disciplined in the past for intemperate, discourteous conduct removed for making additional inappropriate comments and criticizing the biblical immorality of an unmarried litigant living with her boyfriend); Furey v. Comm'n on Judicial Performance, 43 Cal.3d 1297, 240 Cal.Rptr. 859, 743 P.2d 919 (1987) (judge removed for committing numerous acts of willful and prejudicial misconduct, including using ethnic and sexual slurs, arbitrarily setting bail, abusing the contempt power, and being impatient and discourteous).
[9] See, e.g., In re Judge Sassone, 959 So.2d 859 (La.2007) (judge suspended without pay for 60 days for extremely sarcastic, rude, and impatient demeanor toward attorney); In re Krake, 942 So.2d 18 (La.2006) (judge suspended from office for remainder of term for, inter alia, presiding while visibly intoxicated and hung over); In re Mathesius, 188 N.J. 496, 910 A.2d 594 (2006) (judge suspended for sarcastic comments and comments made about another judge in front of jury); Disciplinary Counsel v. O'Neill, 103 Ohio St.3d 204, 815 N.E.2d 286 (2004) (judge suspended for two years for discourteous conduct, swearing in court, coercive expediting tactics, and misrepresenting the truth); In re Moore, 464 Mich. 98, 626 N.W.2d 374 (2001) (judge suspended for six months without pay for discourteous and unduly severe conduct, impatience, and interrupting litigants); In re Elliston, 789 S.W.2d 469 (Mo. 1990) (judge suspended without pay for 15 days for discourteous, abrasive, and abusive conduct toward attorneys).
[10] We note that even some cases in which reprimands have been issued involve somewhat more serious misconduct than that at issue here. See, e.g., In re Complaint Against Lindner, 271 Neb. 323, 710 N.W.2d 866 (2006) (judge reprimanded for making racially derogatory remark to defendant); In re Newton, 758 So.2d 107 (Fla.2000) (judge reprimanded for demeaning, abusive, and sarcastic comments and behavior, including calling one litigant a "dropout," warning another that she was "not going to get by on good looks," and insisting that female attorney with leg deformities wear a skirt suit); In re Schwartz, 755 So.2d 110 (Fla.2000) (judge reprimanded for refusing to hear cases argued by legal interns and ridiculing them in front of clients, even after previous warnings); In re Judicial Disciplinary Proceedings Against Michelson, 225 Wis.2d 221, 591 N.W.2d 843 (1999) (judge reprimanded for calling daughter of litigant a "slut").
[11] See, e.g., In re Schapiro, 845 So.2d 170 (Fla. 2003) (judge reprimanded for belittling, embarrassing, and yelling at attorneys, including calling them "stupid"); Ex parte Haymans, 767 So.2d 1173 (Fla.2000) (judge reprimanded for ongoing pattern of rudeness); In re Wood, 720 So.2d 506 (Fla. 1998) (judge reprimanded for rude behavior after prior admonishment); In re Inquiry Concerning a Judge re Wright, 694 So.2d 734 (Fla. 1997) (judge reprimanded for two occasions of rude and inappropriate conduct, including telling a party to "keep your mouth shut"); In re Marko, 595 So.2d 46 (Fla. 1992) (judge reprimanded for rude remarks).
[12] See, e.g., In re Bowers, 721 So.2d 875 (La. 1998) (judge censured for inappropriate language and insensitive, impatient, and discourteous behavior, including swearing, warning defendants that he was "gunning for" them, and calling litigants "hoodlums"); In re Rasmussen, 43 Cal.3d 536, 537-38, 236 Cal.Rptr. 152, 734 P.2d 988 (1987) (judge censured for, inter alia, persistently abusive and sarcastic demeanor toward litigants); Matter of Albano, 75 N.J. 509, 513, 384 A.2d 144 (1978) (judge censured for impatient, sarcastic demeanor, including telling a litigant, "I don't want to listen to [you]"); Matter of Waltemade, 409 N.Y.S.2d 989 (N.Y.Ct.Jud. 1975) (judge censured after prior admonishment for 46 instances of being rude, impatient, and sarcastic, and for interrupting and yelling at assistant attorney general). But see Dodds v. Comm'n on Judicial Performance, 12 Cal.4th 163, 906 P.2d 1260, 48 Cal.Rptr.2d 106 (1995) (censure not appropriate sanction for rudeness, hostile interruptions, yelling, telling biased jokes, and interference with investigation).
[13] Indeed, if Judge Eiler fails to improve her conduct and demeanor on the bench in response to this disciplinary action, as she did with respect to the last one, removal may be warranted. Of course, if King County voters prefer not to wait for further offense, they can achieve the same result at the next election.
[1] (c) Mitigating/Aggravating Factors. Whenever the commission finds grounds for discipline, it shall consider the following nonexclusive factors in determining the appropriate discipline to be ordered:

(1) Characteristics of Misconduct.
(A) Whether the misconduct is an isolated instance or evidence of a pattern of conduct;
(B) The nature, extent, and frequency of occurrence of the acts of misconduct;
(C) Whether the misconduct occurred in or out of the courtroom;
(D) Whether the misconduct occurred in the judge's official capacity or in the judge's private life;
(E) Whether the judge flagrantly and intentionally violated the oath of office;
(F) The nature and extent to which the acts of misconduct have been injurious to other persons;
(G) The extent to which the judge exploited the judge's official capacity to satisfy personal desires; and
(H) The effect the misconduct has upon the integrity of and respect for the judiciary.
(2) Service and Demeanor of the Judge.
(A) Whether the judge has acknowledged or recognized that the acts occurred;
(B) Whether the judge has evidenced an effort to change or modify the conduct;
(C) The judge's length of service in a judicial capacity;
(D) Whether there has been prior disciplinary action concerning the judge;
(E) Whether the judge cooperated with the commission investigation and proceeding; and
(F) The judge's compliance with an opinion by the ethics advisory committee shall be considered by the commission as evidence of good faith.
CJCRP rule 6 (third emphasis added) (footnote omitted).